1    David M. Given (State Bar No. 142375)
     Nicholas A. Carlin (State Bar No. 112532)
2    PHILLIPS, ERLEWINE & GIVEN LLP
     50 California Street, 35th Floor
3    San Francisco, CA 94111
     Tel: 415-398-0900
4    Fax: 415-398-0911

5    Kara M. Wolke (State Bar No. 241521)
     PHILLIPS, ERLEWINE & GIVEN LLP
6    1221 Second Street, 3rd Floor
     Santa Monica, CA 90401
7    Tel: 310-832-0900
     Fax: 310-514-0911
8
     Leonard B. Simon (State Bar No. 58310)
9    LAW OFFICES OF LEONARD B. SIMON
     655 West Broadway, Suite 1900
10   San Diego, CA 92101
11   Tel: 619-231-1058
     Fax: 619-231-7423
12
     Attorneys for Plaintiff
13

FILED
2011 APR -1 P 3:35
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
N. DIST. OF CALIFORNIA

E-filing

14                    UNITED STATES DISTRICT COURT

15                  NORTHERN DISTRICT OF CALIFORNIA

16

17   RICK JAMES, by and through THE         )   Case No:   CV 11 1613 JCS
     JAMES AMBROSE JOHNSON, JR.,             )
18   1999 TRUST, his successor in interest,  )   CLASS ACTION COMPLAINT FOR
     individually and on behalf of all others )   BREACH OF CONTRACT, ETC., FOR
19   similarly situated,                     )   MONETARY DAMAGES AND
                                             )   INJUNCTIVE RELIEF
20              Plaintiff,                    )
                                             )
21                                           )
     vs.                                     )
22                                           )
                                             )
23   UMG RECORDINGS, INC., a Delaware        )
     corporation,                            )
24                                           )
                                             )
25              Defendant.                    )
     _____        )
26

27

28

CLASS ACTION COMPLAINT FOR BREACH OF CONTRACT, ETC.

1 | Plaintiff, on behalf of itself and of all those similarly situated, alleges as follows:

2 | **NATURE OF THE ACTION**

3 | 1.     Plaintiff brings this class action for breach of contract and certain statutory

4 | violations under California law against defendant UMG Recordings, Inc., a Delaware

5 | corporation with its headquarters in the State of California and having significant business

6 | activity in this District, together with its divisions, related and affiliated entities, owned and

7 | distributed record labels, and all of its predecessors in interest (collectively, "UMG").

8 | 2.     This class action is predicated on UMG's failure to properly account for and pay

9 | its recording artists and music producers for income it has received, and continues to receive,

10 | from the licensees of its recorded music catalog for the sale of digital downloads and ringtones

11 | (or "mastertones"). UMG and one of its owned and distributed record labels, Aftermath

12 | Records, spent millions of dollars contesting this precise issue in protracted litigation. But the

13 | Ninth Circuit Court of Appeals found that UMG failed as a matter of law to properly account for

14 | and pay such income to the royalty participants in that case, a decision that the U.S. Supreme

15 | Court recently declined to review. See *F.B.T. Productions, Inc. v. Aftermath Records*, 621 F.3d

16 | 958 (9th Cir. Sept. 3, 2010), *cert. denied*, 79 U.S.L.W. 3370 (March 21, 2011).

17 | 3.     Plaintiff here alleges, and the Ninth Circuit found, that digital download and

18 | ringtone income received by UMG derives from a license. Holding that UMG's agreements

19 | with "iTunes [the marketplace's primary source for legitimate digital downloads of recorded

20 | music], cellular phone carriers [like Verizon and AT&T] and other third parties to use its sound

21 | recordings to produce and sell permanent downloads and mastertones. . .qualify as licenses" (*id.*

22 | at 964), the Ninth Circuit compelled UMG to treat the income derived from those agreements as

23 | licensing income and to account to and pay the royalty participants in that case accordingly. By

24 | this lawsuit, Plaintiff seeks to compel UMG to account to and pay its other recording artists and

25 | music producers (i.e., those not directly involved in the *F.B.T.* litigation) their rightful share of

26 | the licensing income paid to UMG for downloads and mastertones of the recorded music

27 | licensed by UMG to these entities.

28 |

1

1      4.    Specifically, this action seeks redress for UMG's continuous violation of the
2  terms of its agreements with recording artists and music producers who, like Plaintiff (and the
3  claimants in the *F.B.T.* case), have the contractual right to a sizeable percentage (typically half)
4  of the income UMG receives from the licensing of sound recordings to others to produce and
5  sell permanent downloads and mastertones. In disregard of that right, UMG has adopted a
6  policy and practice of paying or crediting such artists and producers only a fraction of the
7  monies due and owing for the licensing of their music for these uses.

8      5.    UMG has justified its underpayment on the pretext that the agreements between
9  UMG and sellers of downloads and mastertones (such as Apple/iTunes, AT&T and the like) are
10 not license agreements, but rather are agreements (sometimes misleadingly referred to by UMG
11 as "resale agreements" and falsely characterized to others in that fashion) indistinguishable from
12 those UMG has with brick-and-mortar stores that sell its CDs and other physical product. Under
13 the agreements between UMG and the members of the Class (defined below), sales of physical
14 product by UMG entitle the recording artists and music producers to a much smaller percentage
15 of the income derived therefrom than does the income derived from a license agreement.

16     6.    The Ninth Circuit rejected the foregoing pretext as a matter of law in the *F.B.T.*
17 case. Nonetheless, UMG has already publicly announced, most recently in an article appearing
18 on March 28, 2011 in the *New York Times*, that the decision by the Ninth Circuit in the *F.B.T.*
19 case "sets no legal precedent" – and that, in substance, it does not intend to alter any of its
20 current policies or practices as they relate to the accounting for and payment of royalties on such
21 income, or to acknowledge past due amounts to their royalty participants for this income. In
22 other words, the rule of law does not apply to UMG.

23     7.    UMG's conduct has substantial monetary consequences for members of the
24 Class. A decent rule of thumb is that for every dollar UMG actually accounts for and pays or
25 credits these artists and producers for digital download and mastertone income, it should be
26 accounting for and paying or crediting anywhere between two and three (or more) dollars.
27 Based upon public reports, Plaintiff estimates that this difference may amount on a class-wide
28 basis to tens of millions of dollars or more each year.

2

1    8.    UMG has systematically violated its contractual obligations to Plaintiff and other
2    members of the Class to make proper royalty payments and/or to properly credit royalty
3    accounts pursuant to agreements between it and its recording artists, music producers and other
4    royalty participants. Moreover, in conjunction with the other conduct alleged below, UMG has
5    done so in a manner that violates California's Unfair Competition Law, Bus. & Prof. Code §
6    17200, et seq.

7    9.    As a consequence of UMG's past and continuing contractual and statutory
8    violations, Plaintiff and the other members of the Class have been damaged through the loss of
9    royalties which UMG has retained for its own benefit. Following extended investigation and
10   public hearing, the California State Senate Select Committee on the Entertainment Industry
11   cautioned the major record companies against engaging in policies and practices that constitute
12   "purposeful neglect" of their royalty participants. See Note: *California's Recording Industry*
13   *Accounting Practices Act, SB 1034: New Auditing Rights for Artists*, 20 Berkeley Tech. L.J. 933
14   (2005). The issue of UMG's "purposeful neglect" in the accounting for this licensing income to
15   its royalty participants is in part central here.

16   10.   Plaintiff is informed and believes that, before eschewing its obligations to its
17   royalty participants, UMG vetted the policies and practices at issue in this case at its highest
18   corporate levels; that it commissioned, either on its own initiative or with the support of the U.S.
19   music industry's principal trade organization, so-called "white papers" on the issue
20   (occasionally carrying the imprimatur of attorney-client communications); that it analyzed
21   internally the financial consequences of its misconduct and cast it in terms of the additional
22   profit to be made by UMG by avoiding its contractual obligations; that it formulated an opaque
23   and artificial method for accounting for and paying its royalty participants for income derived
24   from such licenses; that it engaged in a sustained public relations effort designed to convince the
25   public that it had employed "groundbreaking" and "enlightened" accounting practices that
26   actually benefitted (rather than cheated) the Class; that it repeatedly made public statements
27   characterizing its agreements with Music Download Providers and Mastertone Providers (as
28   defined below) as a "resale" agreement; and that it sought to enlist those Providers in an effort to

3

1   re-characterize its dealings with them to facilitate its conduct toward its artists and producers. In

2   addition, Plaintiff is informed and believes that UMG employed and continues to employ a host

3   of unfair tactics and strategies in its dealings with royalty participants to minimize its exposure

4   from the unlawful conduct at issue here, all of which were also subject to consideration, review

5   and approval by and among the highest placed officers and directors of UMG.

6          11.    Plaintiff seeks compensatory damages on behalf of Plaintiff and the Class, as

7   well as a judgment declaring Plaintiff's and the Class' rights under their agreements to the

8   proper accounting for and payment or crediting of royalties with respect to the income derived

9   from UMG's licensing of its recordings to others to produce and sell digital downloads and

10  mastertones now and in the future.

11                                    **THE PARTIES**

12                                     **Rick James**

13         12.    Plaintiff was established as a living trust organized and subsisting under the laws

14  of the State of California, and presently owns as successor in interest all intellectual property

15  developed and owned by the singer, songwriter, musician, producer and performer James

16  Ambrose Johnson, Jr., an individual better known to the public as RICK JAMES.

17         13.    Over the course of a decades-long career, RICK JAMES earned multiple gold,

18  platinum and multi-platinum record awards and chart-topping singles (scoring four #1's on the

19  U.S. R&B chart, including the smash hits "Superfreak" and "Give It To Me Baby"), in

20  becoming one of the foremost artists working in the funk/R&B and soul genres of the music

21  industry during the 1970's and 1980's. Among other things, he is credited with "rescuing"

22  Motown Records (now a part of UMG) during that period, providing hits (performed and

23  recorded by himself and others, including The Temptations, The Mary Jane Girls, Eddie

24  Murphy, Teena Marie and Smokey Robinson) which he wrote and produced that updated the

25  label's style and renewed its profitability and stature.

26         14.    RICK JAMES died in August 2004 in the State of California. In addition to his

27  lasting reputation as a funk music provocateur, which is legendary, RICK JAMES' body of

28  recorded music as both recording artist and producer remains of enduring quality, critical and

                                            4

1  cultural importance, and significant commercial value.

2                                    **UMG**

3        15.    UMG claims to be the world's largest recorded music company. According to

4  public reports, it boasts a 30% share in the market for recorded music worldwide. Its labels

5  include, among others, Interscope Geffen A&M Records (which includes Aftermath Records),

6  Island Def Jam Music Group, and Universal Motown Republic Group. According to its website

7  (www.umusic.com), UMG "discovers, develops, markets and distributes recorded music

8  through a network of subsidiaries, joint ventures *and licensees* in 77 countries, representing 98%

9  of the music market." (Emphasis added.)

10                         **JURISDICTION AND VENUE**

11       16.    Jurisdiction exists in this Court pursuant to 28 U.S.C. § 1332(d)(2). Venue is

12  proper in this Court pursuant to 28 U.S.C. § 1391(a) & (c).

13                     **SUBSTANTIVE ALLEGATIONS OF FACT**

14                         **Music Download Services**

15       17.    Around the time of JAMES' death, a new and viable method of commercial

16  exploitation of recorded music, music download services ("Music Download Services"), was

17  developed and has since seen widespread implementation in the marketplace. The companies

18  offering Music Download Services include the Apple/iTunes Store (by far the largest in terms of

19  volume and market-share), Amazon.com and Liquid Digital Media (walmart.com), among

20  others (collectively, "Music Download Providers"). It is an adjudicated fact that all of these

21  companies have obtained licenses from UMG authorizing these companies to sell or otherwise

22  distribute, via digital downloads, its catalog of sound recordings.

23       18.    Using Music Download Services, consumers pay a fee to download a copy of a

24  sound recording in the form of a digital audio file (a "Music Download"), copying the file from

25  the Music Download Provider to the consumer's personal computer or other digital storage

26  device. The best known Music Download Provider is Apple's iTunes, which typically charges

27  between $0.99 and $1.29 for a single musical track that the consumer stores on an authorized

28  device such as an iPod. Certain other Music Download Providers operate a subscription service

                                        5

1  that allows consumers to download musical performances for a set monthly fee, with the ability
2  to play the musical performances contingent on the consumer's continuing payment of the
3  monthly subscription charge. Certain others offer both.

4      19.      With respect to the licensing of Music Download Services, UMG does not
5  manufacture or warehouse any physical product or packaging, nor does it ship or sell any
6  product to stores or other distribution points, and faces no risk of breakage or the return of
7  unsold product. Rather, as the Ninth Circuit held, it is licensing its catalog of recordings to third
8  parties for sale or distribution by them via digital download.

9      20.      The volume and revenue represented by Music Download Services has grown
10 since RICK JAMES' death. The growing percentage of sound recordings sold or distributed by
11 Music Download Services means that UMG's improper accounting significantly understates the
12 royalties owed to Plaintiff and the other class members.

13                          **Mobile Phone Mastertones**

14     21.      Mastertones provide another avenue for the licensing of sound recordings. A
15 mastertone is a portion of a sound recording converted into a digital file that consumers
16 download directly to their mobile phones to customize the sound the phones make when they
17 receive a call, or that a caller hears when placing a call, paying between $1.00 and $3.00 for
18 each mastertone downloaded. The companies offering mastertones include mobile phone
19 companies (AT&T Wireless, Sprint, T-Mobile and Verizon Wireless, among others), content
20 owners (MTV and VH1, among others) and third-party aggregators (Zed, Hudson Soft, jamster
21 and iTunes, among others) (collectively, "Mastertone Providers"). It is an adjudicated fact that
22 all of these Mastertone Providers have obtained licenses from UMG authorizing these
23 companies to distribute and sell mastertones of the recordings in its catalog of sound recordings.

24     22.      With respect to the licensing of mastertones, UMG does not manufacture or
25 warehouse any physical product or packaging, nor does it ship or sell any product to stores or
26 other distribution points, and faces no risks of breakage or the return of unsold product. Rather,
27 as the Ninth Circuit held, it is licensing its catalog of sound recordings to third parties for sale or
28 distribution by them via digital download.

6

1   23.   The growing percentage of sound recordings sold or distributed by Mastertone

2   Providers means that UMG's improper accounting significantly understates the royalties owed to

3   Plaintiff and the other class members. According to a recent report by the International

4   Federation for the Phonographic Industry (which can be found at www.ifpi.org), a trade group to

5   which UMG belongs, global digital music sales (which include both varieties of downloads

6   described above) grew to $4.6 billion in 2010. If its reported market share is an accurate

7   measure, then UMG's income from these and other such licenses may have exceeded one billion

8   dollars last year.

9                              **The JAMES-UMG Recording Agreements**

10  24.   On or about July 18, 1977, and again on or about January 1, 1979, JAMES

11  (individually and later through a so-called "loan-out" entity owned and controlled by him)

12  entered into a recording artist and producer agreement with Motown Record Corporation,

13  subsequently acquired by UMG. All or substantially all of the recorded music in issue between

14  Plaintiff and UMG is governed by the 1979 agreement. The 1977 agreement and 1979

15  agreement shall be referred to collectively as the "James Agreement" hereinafter. Plaintiff is

16  successor in interest to the James Agreement of JAMES and his loan-out entity.

17  25.   The James Agreement governs, among other things, the payment of royalties to

18  JAMES (and therefore Plaintiff) for the sale and licensing of the sound recordings delivered by

19  him to Motown.

20  26.   The James Agreement provides that Motown "will pay" JAMES what it defines

21  as a "Licensed Rate" of Motown's "net receipts based on actual sales" of "records sold by

22  [Motown]'s licensees." The pertinent provision reads more fully as follows:

23              "With respect to records sold by [Motown]'s licensees, including licensed

24              record clubs, either within or outside the United States, [Motown] will pay

25              to [JAMES] a royalty equal to fifty percent (50%) (less the percentage, if

26              any, payable to an Outside Producer) of [Motown]'s net receipts based on

27              actual sales (as shown on statements furnished to [Motown] by such

28              licensees and actually paid or credited against advances and less any

                                                 7

1          inclusion of A.F.of M. payments if actually paid) and shall be computed in

2          the national currency of the country of manufacture or sale, as [Motown]

3          is paid, at the rate of exchange in effect at the time of payment or credit to

4          [Motown], and shall not accrue until payment or credit has been received

5          by [Motown] in the United States; provided if the licensed company is an

6          affiliate, subsidiary or commonly owned, then payment is deemed to

7          accrue to [JAMES] when payment is received by that licensee."

8      27.     "Records sold" and "sales," as defined in the James Agreement, mean "those

9   records shipped by [Motown] (or on their behalf) hereunder which are paid for and not returned

10   or exchanged." UMG admitted in the *F.B.T.* case (621 F.3d at 966) that permanent downloads

11   and mastertones are records as that term is commonly used and understood in the recorded

12   music industry.

13     28.     The James Agreement provides, among other things, that JAMES would perform,

14   or cause to be produced, and deliver to Motown certain recordings featuring his performances,

15   as well as the performances of others, and that Motown would manufacture, distribute, sell and

16   license these recordings in various configurations throughout the world.

17     29.     The James Agreement further provides, among other things, that Motown (and,

18   as successor-in-interest, UMG, which thereafter assumed in law and fact all of Motown's

19   contractual obligations) would (a) provide various financial benefits to JAMES, and (b) furnish

20   semi-annual royalty accounting statements setting forth the computation of royalties for the sale

21   or license of JAMES' recordings, accompanied by any royalty payments due.

22     30.     Under the James Agreement, UMG was obligated to render accurate and

23   complete royalty accounting statements and to properly and accurately account for and credit

24   JAMES for royalties generated by the licensing of JAMES' sound recordings.

25                    **The Class-UMG Recording Agreements**

26     31.     Upon information and belief, the foregoing provisions of the James Agreement

27   are, as relevant to this claim, the same or substantially similar to those found in other Motown

28   production and recording agreements as well as across all or substantially all of UMG's owned

8

1  and distributed record labels entered into up until approximately April 2004. Those agreements
2  call for accountings and payments to UMG's recording artists and producers for licensing of
3  masters as a percentage (usually 50%) of the receipts of UMG, rather than a lesser percentage as
4  a royalty paid to the artist or producer based on the retail list price of each unit sold.

5                            **CLASS ACTION ALLEGATIONS**

6      32.    Plaintiff brings this class action pursuant to Federal Rules of Civil Procedure
7  23(a) and 23(b) on its own behalf and on behalf of:

8                  All persons and entities (but excluding UMG and any person, trust, firm,
9                  corporation or entity affiliated with or related to UMG) who entered into
10                 UMG (including its label and affiliates as described above) production or
11                 recording agreements from January 1, 1965 to April 30, 2004 and who,
12                 along with their agents, successors in interest, assigns, heirs, executors and
13                 administrators, received royalties on, or financial credits or adjustments
14                 for, income received by UMG from Music Download Services and
15                 Mastertone Providers (hereinafter, the "Class") at a rate less than the rate
16                 provided for licensing income in their contract with UMG.

17     33.    This action is properly maintainable as a class action.

18     34.    The Class for whose benefit this action is brought is so numerous that joinder of
19  all class members is impracticable. While Plaintiff does not presently know the exact number of
20  class members, Plaintiff is informed and believes that there are hundreds or thousands of class
21  members, and that those class members can be readily determined and identified through
22  UMG's files and, if necessary, appropriate discovery.

23     35.    There are questions of law and fact which are common to class members and
24  which predominate over any questions affecting only individual members of the Class. These
25  common questions include:

26     (a)    Whether UMG violated the agreements to which it was and continues to be
27  bound by, among other things, mischaracterizing licensing income received by it from Music

28

                                          9

                  CLASS ACTION COMPLAINT FOR BREACH OF CONTRACT, ETC.

1   Download Providers and Mastertone Providers in accountings rendered to its royalty

2   participants in violation of those agreements;

3         (b)     Whether UMG benefited financially from its wrongful acts;

4         (c)     Whether UMG continued to collect this licensing income and continued to

5   misreport the royalties due for such income to its recordings artists and music producers despite

6   knowledge of the illegality of said practice;

7         (d)     Whether UMG acted in a manner calculated to conceal the illegality of its actions

8   from its recording artists and music producers;

9         (e)     Whether UMG, by way of the conduct alleged herein, engaged in deceptive or

10   unfair acts or practices in violation of California unfair trade practices laws including, but not

11   limited to, California Business & Professions Code § 17200, *et seq.* and § 17500, *et seq.*, for

12   which Plaintiff and the other class members are entitled to recover;

13         (f)     Whether Plaintiff and the other class members have been damaged by UMG's

14   actions or conduct; and

15         (g)     Whether, assuming UMG intends to continue to breach its contractual obligations

16   to Plaintiff and the other class members, and/or to violate California state statutory law,

17   declaratory and injunctive relief is appropriate to curtail UMG's conduct as alleged herein.

18       36.     Plaintiff is committed to prosecuting this action and has retained competent

19   counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the

20   other class members and Plaintiff has the same interests as the other class members. Plaintiff has

21   no interests that are antagonistic to, or in conflict with, the interests of the other members of the

22   Class. Plaintiff is an adequate representative of the class and will fairly and adequately protect

23   the interests of the Class.

24       37.     The prosecution of separate actions by individual members of the Class could

25   create a risk of inconsistent or varying adjudications with respect to individual members of the

26   Class which could establish incompatible standards of conduct for UMG, or adjudications with

27   respect to individual members of the class which would, as a practical matter, be dispositive of

28   the interests of the members of the Class not parties to the adjudications.

10

1      38.   Furthermore, as the damages suffered by some of the individual class members
2  may be relatively small, the expense and burden of individual litigation make it impracticable
3  for the individual members of the Class to redress the wrongs done to them individually.

4      39.   Plaintiff anticipates no unusual difficulties in the management of this litigation as
5  a class action. Class members may be identified from UMG's records and such class members
6  may be notified of the pendency of this action by mail or by electronic means (like email), using
7  techniques and a form of notice customarily used in class actions.

8      40.   For the above reasons, a class action is superior to other available methods for the
9  fair and efficient adjudication of this action.

10
## SUBSTANTIVE ALLEGATIONS
## SUPPORTING A RECOVERY TO PLAINTIFF AND THE CLASS
11

12      41.   UMG has entered into production and recording agreements with persons or
13  entities in connection with the creation of sound recordings, which entitle those persons or
14  entities to receive a portion of the monies derived from the licensing of such recordings, in the
15  nature of payments, or credits against advances paid by UMG until such advances are recouped,
16  after which royalties are paid.

17      42.   UMG entered into a production or recording agreement with each recording artist
18  or music producer whose musical performances UMG intended to exploit through the licensing
19  of sound recordings of these performances both in the U.S. and abroad.

20      43.   These agreements set forth and govern the calculation, distribution and payment
21  to each class member of their portion of the income derived from the licensing of sound
22  recordings of his or her performances or other creative contribution.

23      44.   Each such agreement contains the same or a substantially similar provision with a
24  formula prescribing the manner in which UMG is required to calculate royalties earned by the
25  music producer or recording artist for sound recordings sold by UMG or its affiliates in the U.S.
26  and around the world; and another different formula prescribing UMG's obligation to account
27  for and pay royalties to the producer or artist for income or receipts from its licensees.

28

11

CLASS ACTION COMPLAINT FOR BREACH OF CONTRACT, ETC.

45.     Each UMG production or recording agreement sets forth a similar or substantially similar formula for calculating a music producer or recording artist's entitlement to a share of licensing receipts received by or credited to UMG, at a substantially higher percentage than the share paid on receipts from the sale of records by it.

46.     It is an adjudicated fact that UMG has licensed all or part of its entire catalogue of sound recordings to Music Download Providers and Mastertone Providers.

47.     It is an adjudicated fact that these licenses involve the grant of rights in and to sound recordings so that such Providers can sell or sublicense downloads and mastertones of the recordings in issue to consumers.

48.     UMG has failed to comply with the provisions of its recording artist and producer agreements and has accounted for the income derived from the licensing of recordings to Music Download Providers and Mastertone Providers as though UMG were actually manufacturing, distributing and selling records itself. In so doing, UMG takes unjustifiable deductions and applies an incorrect formula for calculating royalties due Plaintiff and the other members of the Class on the income UMG derives from its licenses with Music Download Providers and Mastertone Providers. UMG's accounting practices, as identified above, result in its retention of practically the full amount of receipts from Music Download Services and Ringtone Providers, rather than paying artists the stated percentage of those receipts provided in the pertinent agreements.

49.     UMG's inappropriate treatment of income received from Music Download Providers, in violation of the pertinent recording artist and producer agreements, results in Plaintiff and the other members of the Class receiving a fraction of the licensing income to which they are contractually entitled.

50.     Similarly, UMG's inappropriate treatment of income received from Mastertone Providers, in violation of the pertinent recording artist and producer agreements, results in Plaintiff and the other members of the Class receiving a fraction of the licensing income to which they are contractually entitled.

12

1    51.    At all relevant times, UMG had a duty and obligation under the James Agreement
2  and its other recording artist and producer agreements to account properly and accurately for
3  income received by it from Music Download Providers and Mastertone Providers to which
4  UMG has licensed the recordings of Plaintiff and the other members of the Class. Rather than
5  fulfill its contractual obligations, UMG has systematically miscalculated the amounts due and
6  owing to Plaintiff and other class members. In addition, UMG has consistently and publicly
7  maintained that its agreements with Music Download Providers and Mastertone Providers are
8  not licenses. As a result, UMG has under-credited and/or underpaid each and every class
9  member, while deriving substantial unearned financial benefits from licensing class members'
10 recordings to Music Download Providers and Mastertone Providers for digital sale or
11 distribution, and it intends to continue to do so.

12                              **FIRST CAUSE OF ACTION**
                                  **(Breach of Contract)**
13

14   52.    Plaintiff repeats and realleges each and every allegation contained in paragraphs
15 1 through 51, as though fully set forth herein.

16   53.    Plaintiff entered into a recording artist and producer agreement with Motown
17 Records, subsequently acquired by UMG, in or about 1977 and in or about 1979.

18   54.    From approximately January 1, 1965 to April 30, 2004, class members
19 commonly entered into recording artist and producer agreements with UMG containing the same
20 or substantially similar terms relating to the treatment of licensing income for accounting
21 purposes, which such income would include, by definition, that income derived from the
22 licensing of recordings to Music Download Providers and Mastertone Providers.

23   55.    Plaintiff and the other class members have performed all, or substantially all, of
24 the obligations imposed on them under their respective recording artist and producer agreements
25 with UMG.

26   56.    By reason of the foregoing, and other acts not presently known to Plaintiff, UMG
27 has materially breached its contractual obligations under the James Agreement and the other
28

13

CLASS ACTION COMPLAINT FOR BREACH OF CONTRACT, ETC.

1  pertinent recording artist and producer agreements and has disregarded the rights of Plaintiff and
2  the other class members.

3      57.    UMG has failed and refused to cure these breaches and continues to incorrectly
4  calculate these royalties in violation of the James Agreement.

5      58.    By reason of the foregoing, Plaintiff and the other class members have been
6  damaged in an amount to be determined at trial.

7                              **SECOND CAUSE OF ACTION**
                                  **(Declaratory Judgment)**
8

9      59.    Plaintiff repeats and realleges each and every allegation contained in paragraphs
10 1 through 58, as though fully set forth herein.

11     60.    Plaintiff contends that, pursuant to the pertinent recording artist and producer
12 agreements, UMG is obligated to pay and/or credit Plaintiff and the other class members a
13 certain percentage of the income UMG derives from licensing the sound recordings of Plaintiff
14 and the other class members to Music Download Services and Mastertone Providers, but that
15 UMG has paid them a lower percentage by mischaracterizing these licenses as the sale by it of
16 product.

17     61.    Plaintiff and the other class members have no adequate remedy at law.

18     62.    By reason of the foregoing, there is a present controversy between Plaintiff and
19 the other class members, on the one hand, and UMG, on the other hand, with respect to which a
20 declaratory judgment should be entered determining that the pertinent recording artist and
21 producer agreements obligate UMG to pay and/or credit Plaintiff the percentage specified for
22 licensing, rather than for product sales, when UMG licenses the recordings of Plaintiff and the
23 other members of the Class, to Music Download Services and Mastertone Providers.

24                              **THIRD CAUSE OF ACTION**
                  **(Common Counts – Open Book Account, Code Civ. Proc. § 337a)**
25

26     63.    Plaintiff repeats and realleges each and every allegation contained in paragraphs
27 1 through 62, as though fully set forth herein.

28

14

1       64.    Pursuant to UMG's agreements with Plaintiff and the other class members, UMG

2 keeps, and at all relevant times has kept, open book accounts reflecting the debits and credits

3 made to each class member's account with UMG from inception. Plaintiff is informed and

4 believes that said open book accounts include entries reflecting income UMG has received, and

5 continues to receive, from its licensees for digital download and mastertone uses.

6       65.    These book accounts constitute the principal records of the transactions between

7 UMG and Plaintiff/the other class members, and Plaintiff is informed and believes that said

8 book accounts are, and at all relevant times were, created in the regular course of business of

9 UMG and kept in a reasonably permanent form and manner.

10       66.    UMG has become indebted to Plaintiff and the other class members on said open

11 book accounts in an amount equal to UMG's underpayment on the income UMG has received,

12 and continues to receive, from its licensees for digital download and mastertone uses. The

13 balance outstanding owed by UMG to Plaintiff and the other class members on said open book

14 accounts can be determined by examining all of the debits and credits recorded for each account,

15 including a calculation of the amount of underpayment with respect to digital download and

16 mastertone uses as reflected in the open book accounts.

17
18

**FOURTH CAUSE OF ACTION**
**(Violations of Unfair Competition Law,**
**California Business & Professions Code § 17200)**

19       67.    Plaintiff repeats and realleges each and every allegation contained in paragraphs

20 1 through 66, as though fully set forth herein.

21       68.    California Business and Professions Code § 17200 prohibits any unlawful, unfair

22 or fraudulent business acts or practices.

23       69.    As detailed in this Complaint, UMG has violated the foregoing law, by engaging

24 in unlawful, unfair and fraudulent business practices. UMG knowingly breached its contracts

25 with Plaintiff and the other members of the Class. UMG either knew, recklessly disregarded, or

26 should have known that its collection of income from Music Download Services and Mastertone

27 Providers was in connection with a license agreement and the royalties payable to Plaintiff and

28 the Class should have been accounted for and paid on that basis. Furthermore, failing to

15

---

CLASS ACTION COMPLAINT FOR BREACH OF CONTRACT, ETC.

1    disclose the unlawful nature of its conduct, and employing such devices as are alleged above, as

2    well as affirmatively representing its authority to collect and account for this income on such

3    basis, had a tendency to mislead recording artists and producers, and the gravity of the

4    misconduct outweighs any possible economic justification for such conduct – of which there is

5    none.

6            70.      The harm to Plaintiff and the class arising from UMG's deceptive and unlawful

7    practices outweighs the utility, if any, of those practices.

8            71.      The conduct described herein is ongoing, continues to this date, and constitutes

9    unfair and fraudulent business acts and practices within the meaning of Business & Professions

10    Code § 17200.

11           72.      Pursuant to California Business and Professions Code § 17203, Plaintiff and the

12    Class that he seeks to represent are therefore entitled to: (a) an Order requiring UMG to cease

13    the acts of unfair competition alleged herein; (b) an Order enjoining UMG from continuing to

14    account for royalties payable to Plaintiff and the class in the manner it does for income derived

15    from such licenses; (c) full restitution of all monies paid to and retained by UMG otherwise

16    payable to Plaintiff and the class, including, but not limited to, disgorgement pursuant to

17    California Code of Civil Procedure § 384; (d) interest at the highest rate allowable by law; and

18    (e) the payment of Plaintiff's attorneys' fees and costs under, among other provisions of law,

19    Cal. Code Civ. Proc. § 1021.5, or otherwise to the extent permitted by law.

20                              **PRAYER FOR RELIEF**

21          **WHEREFORE**, Plaintiff, on behalf of itself and the other class members, prays for

22    judgment against UMG as follows:

23          A.      Determining that this is a proper class action, and certifying Plaintiff as a class

24    representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as

25    Lead Counsel;

26

27

28

16

1    B.    On the First Cause of Action, a judgment awarding Plaintiff and the other class

2    members restitution and/or compensatory damages, the exact amount to be proven at a trial of

3    this action, together with interest thereon;

4    C.    On the Second Cause of Action, an order and judgment declaring that UMG's

5    recording agreements obligate UMG to pay and/or credit Plaintiff the percentage specified for

6    licensing, rather than for product sales, when UMG licenses the recordings of Plaintiff and the

7    other members of the Class, to Music Download Services and Mastertone Providers;

8    D.    On the Third Cause of Action, a judgment awarding Plaintiff and the other class

9    members compensatory damages in an amount equal to UMG's underpayment on Plaintiff and

10   the other class members' royalty accounts, the exact amount to be proven at a trial of this action,

11   together with interest thereon;

12   E.    On the Fourth Cause of Action, an order and judgment (i) requiring UMG to

13   cease the acts of unfair competition alleged herein; (ii) enjoining UMG from continuing to

14   account for royalties payable to Plaintiff and the class in the manner it does for income derived

15   from licenses with Music Download Providers and Mastertone Providers; and (iii) full

16   restitution of all monies paid to and retained by UMG otherwise payable to Plaintiff and the

17   class, including, but not limited to, disgorgement pursuant to California Code of Civil Procedure

18   § 384, together with interest thereon;

19   F.    Awarding Plaintiff and the other class members pre- and post-judgment interest,

20   as well as reasonable attorneys' fees, expert fees, costs and expenses, as may be permitted by

21   law; and

22   G.    Awarding such other and further relief as the Court may deem just and proper.

23

24   Dated: April 1, 2011                     PHILLIPS ERLEWINE & GIVEN LLP

25

26                                           By:

27                                               David M. Given

28

19

CLASS ACTION COMPLAINT FOR BREACH OF CONTRACT, ETC.

1

### JURY TRIAL DEMANDED

2

Plaintiff for itself and the class hereby demands a trial by jury.

3

4

5   Dated: April 1, 2011                              PHILLIPS ERLEWINE & GIVEN LLP

6

7                                                     By:_____

8                                                          David M. Given

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

20

CLASS ACTION COMPLAINT FOR BREACH OF CONTRACT, ETC.