Leonard B. Simon (State Bar No. 58310)
lens@rgrdlaw.com
LAW OFFICES OF LEONARD B. SIMON
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone:  619-338-4549
Facsimile:   619-231-7423

*Attorneys for Plaintiffs and the Class*

[Additional Counsel Appear on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICK JAMES, by and through THE JAMES AMBROSE JOHNSON, JR., 1999 TRUST, his successor in interest; CARLTON DOUGLAS RIDENHOUR, d/b/a "CHUCK D," individually and as a member of PUBLIC ENEMY; WHITESNAKE, a doing business as designation of David Coverdale, by and for WHITESNAKE PRODUCTIONS (OVERSEAS) LIMITED; DAVE MASON; OTIS WILLIAMS and  RON TYSON, jointly d/b/a THE TEMPTATIONS; and ROBERT WALTER "BO" DONALDSON, individually and d/b/a BO DONALDSON AND THE HEYWOODS; WILLIAM MCLEAN, a/k/a "WILL MCLEAN" and p/k/a "MISTA LAWNGE," and ANDRES TITUS, p/k/a "DRES," jointly d/b/a BLACK SHEEP, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> UMG RECORDINGS, INC., a Delaware corporation, <br><br> Defendant. | Case No.:  CV-11-1613 (SI) <br><br> **CONSOLIDATED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

1   Plaintiffs, individually and on behalf all those similarly situated, allege upon personal

2   knowledge as to themselves and their own acts, and upon information and belief as to all other

3   matters, based upon, among other things, the investigation made by and through their attorneys, as

4   follows:

5   **I.       INTRODUCTION**

6   1.       By the beginning of the new millennium, and despite concerted legal action against

7   them, Napster and other illegal music download services had begun decimating the recorded music

8   industry.  By its own account, that industry was losing billions of dollars in revenue each year to

9   online piracy.  A lot of record labels were in danger of going bankrupt.  Many did.

10   2.       The defendant in this case, UMG Recordings, Inc., together with its various

11   affiliated and subsidiary entities described below ("UMG"), survived as a wholly owned

12   subsidiary of French media conglomerate Vivendi, which bought UMG in 2000 at a substantial

13   discount from its previous purchase price.[1]  UMG attempted to meet the challenge posed by illegal

14   music downloads by setting up its own online music service.  That effort failed miserably.  One

15   such service, PressPlay, earned a place in PC World's 2003 list of the "25 Worst Tech Products of

16   All Time," which stated that "the service's stunningly brain-dead features showed that the record

17   companies still didn't get it."

18   3.       Having failed in its attempt to create its own online music service, UMG was

19   forced to turn to third-party licensees, such as Apple and common carriers like AT&T and Sprint,

20   for an internet solution.  That decision posed a dilemma for UMG, however.  The typical

21   recording artist agreement calls for a royalty rate of 10-15% for records sold by UMG, but 50%

22   for licensing revenue.  So UMG, run almost entirely by lawyers, embarked on a scheme to defraud

23   its artists by claiming that its deals with Apple, Sprint and other so-called "permanent" download

24

---

25   [1]   UMG is an entirely separate company from Universal Studios, the film and television company,
owned by NBC/Universal, which is in turn owned by cable operator Comcast (51%) and General

26   Electric (49%).  It is one of the world's two largest record labels, with control of approximately
30% of the recorded music market (including downloads) according to a 2011 Nielsen Soundscan

27   report.  See http://www.businesswire.com/news/home/20120105005547/en/Nielsen-Company-
Billboard %E2%80%99s-2011-Music-Industry-Report.

28

CONSOLIDATED CLASS ACTION
COMPLAINT – Case No. CV-11-1613 (SI)

providers (described below) were sale rather than license agreements. UMG conceived, approved and undertook this deception at its highest executive level.

4. UMG did so by creating out of whole cloth a phony "business model" by which it was supposedly "selling" downloads to the permanent download providers and those providers were "reselling" them to consumers. To that end, UMG's lawyers sought to delete the word "license" from proposed agreements with these providers. Many of the providers, such as Sprint, refused to call the licenses something that they were not, and the license language stayed. But others, such as Apple, agreed to UMG's proposed language, as it did not really matter to Apple what UMG wanted to call their agreements.

5. Then, regardless of what those agreements said (or really were), UMG started paying its artists for the income it derived from these licenses at the lower "record sold" rate on its receipts (or income) derived from these agreements. UMG carried over this fiction into its accountings to its artists, which deliberately and systematically miscategorized and misrepresented the nature of this income to them, classifying it as "sales" income instead of (as it had previously done) "licensing" income, reporting it together with other sales activity (including its own), and failing to disaggregate that income or to identify it by source.

6. UMG spent years engaging in this cover up. Since almost all of its executives involved in the foregoing wrongful conduct were (and are) lawyers, UMG consistently invoked not only business confidentiality but also the attorney-client privilege to cloak their deliberations on this subject in secrecy. It has continued to do so in this lawsuit. Moreover, when from time to time artists' and producers' representatives and royalty auditors asked to see the so-called "resale agreements" with the permanent download providers, UMG refused to provide them even though it typically produced agreements with its other licensees. Finally, F.B.T. Productions (Eminem's producer) sued UMG and, after years of contentious litigation, won in *F.B.T. Productions v. Aftermath Records*, 621 F.3d 958 (9th Cir. 2010), *cert. denied*, ___ U.S. ___, 131 S.Ct. 1677 (2011), establishing as a matter of law what all the lawyers at UMG certainly knew from the start – that these arrangements were licenses.

7.      The internet has transformed the nature of the recorded music business in many new and unanticipated ways.  Both permanent music downloads (the ones in issue here) and so-called "conditional or limited" downloads (as to which UMG did not manufacture an excuse to avoid paying at the 50% license rate) are now an important part of UMG's revenues.  All of the revenue from those uses derives from licenses with Apple and others.  As both a legal and an equitable matter, that revenue should be a significant part of artists' and producers' royalties, all of it to be shared on a licensed rate basis.

8.      Faced with the transformation of its business, UMG abused its powers under its recording artist and producer agreements so as to defeat their essential purpose, in both letter and spirit.  It did so in bad faith, on a class-wide basis and with the aim of depriving all artists and producers of their contractually-owed revenues.  The monies due the Class (as defined below), either in compensatory damages or restitution (depending on the cause of action), potentially run into the hundreds of millions of dollars.

9.      These consolidated class action proceedings brought by artists and producers such as Rick James (by and through a trust), Chuck D., Dave Mason, Otis Williams (an original member of the Temptations) and others ensued.  By their lawsuits, now consolidated, Plaintiffs seek recovery on behalf of themselves and all of UMG's recording artists and music producers (referred to below collectively as "artists") whom UMG deliberately misled and underpaid on this licensing income over the years.

## II.      NATURE OF THE ACTION

10.      Plaintiffs bring this nationwide class action for breach of contract, breach of the covenant of good faith and fair dealing, and statutory violations of various state laws against UMG and its divisions, related and affiliated entities, owned and distributed record labels, and predecessors in interest, including, but not limited to, the following: The Island Def Jam Motown Music Group, Universal Music Group Nashville, Universal Republic Records, Interscope-Geffen-A&M, Universal Music Latin Entertainment, Decca Label Group, Universal Music Enterprises, V2/Co-Operative Music, The Verve Music Group, Show-Dog-Universal Music, Universal Music

UK, and Fontana Distribution.  This action arises from UMG's failure to properly account for and pay to Plaintiffs and the Class monies stemming from the licensing or leasing (these terms are interchangeable) of Plaintiffs' and Class members' recorded performances and recordings produced by them to "Music Download Providers" and "Ringtone Providers" (collectively referred to herein as "Digital Content Providers" and defined below).

11.     This class action is predicated on UMG's failure to properly account for and pay its artists for income it has received, and continues to receive, from Digital Content Providers for so-called "permanent" downloads (including ringtones or "mastertones").  UMG and one of its owned and distributed record labels, Aftermath Records, spent millions of dollars contesting this precise issue in the *F.B.T.* case.  But, as noted above, the Ninth Circuit found as a matter of law that these agreements were, in fact, licenses, and that UMG failed to properly account for and pay such income to plaintiffs in that case, a decision that the U.S. Supreme Court declined to review.

12.     Plaintiffs here allege, as the Ninth Circuit found, that permanent download income received by UMG derives from a license.  Holding that UMG's agreements with "iTunes [the marketplace's primary source for legitimate digital downloads of recorded music], cellular phone carriers [like Verizon and AT&T] and other third parties to use its sound recordings to produce and sell permanent downloads [are] licenses" (*id*. at 964), the Ninth Circuit compelled UMG to treat the income derived from those agreements as licensing income and to account to and pay the plaintiffs in that case accordingly.  By this lawsuit, Plaintiffs seek to compel UMG to account to and pay all of its other artists their rightful share of this licensing income.

13.     UMG is an amalgam of record labels acquired over the years.  Nonetheless, in the ordinary course of its business, UMG used form recording artist and producer agreements.  These agreements have evolved over time to more specifically address new forms of selling or otherwise exploiting recorded music.  This transpired with respect to UMG's download business starting around 2003, when UMG made a corporate-wide decision to be clear as to the method of royalty calculations with respect to the digital delivery of recorded music vis-à-vis its artists.  Starting with the advent of iTunes, and following the multiple failed attempts to create its own online

music platform, UMG revised its form contract, and from that period forward, began including explicit provisions in its new recording agreements dealing with music downloads and the payments to be made to artists from the income derived from them.  Accordingly, only so-called "legacy" recording artist and producer agreements from before April 30, 2004 are at issue here.

14.     These legacy agreements all share the following basic structure in form, function and practice.  If income was derived from a record manufactured and sold by or through UMG and/or its distributors, then UMG would pay the artist a record royalty, typically a fraction (10-15%) of the wholesale or retail price of the record, tape or CD in question.  However, if income was derived via a third-party license, then UMG would pay the artist a share (usually 50%) of UMG's receipts from that license.

15.     For some older artists, the "record sold" royalty rate is even worse, and the consequence of the policy and practice at issue here is even more damaging to these artists.  Thus, for example, The Temptations are entitled to six percent on the retail price of their records sold under a 1971 recording artist agreement with Motown Records.  Under its current policy and practice, UMG has combined this low record sold rate with the underpayment for permanent downloads, to pay approximately *two cents per download*, out of the 70 cents paid to UMG by Apple on that artist's catalog of recorded music.   Many Motown legacy artists have similar contracts.[2]

16.     Even where the language of a legacy agreement was not clear or even contradictory on the subject, the foregoing distinction between UMG sales and third-party licensing constituted UMG's course of performance, which was also consistent with industry custom and practice.  That custom was that if UMG licensed music to a third-party for use or exploitation, then the income derived from that license would be treated differently than the income UMG derived from making

---

[2]   Those Motown artists appeared as amicus parties in the Ninth Circuit on the side of the F.B.T. plaintiffs via the Motown Alumni Association, a group of former Motown artists based in Detroit, Michigan.  As reflected in its brief, that group's expectation was that a victory by the plaintiffs in the *F.B.T.* case would inure to other artists' benefit.  UMG dashed that expectation in public statements made almost immediately after the U.S. Supreme Court declined review in the case, as noted below.  The first of a series of putative class actions against UMG, now consolidated here, followed days later on behalf of Motown legacy artist Rick James.

1  and selling "records" in the ordinary course of its traditional manufacturing and distribution

2  ("brick-and-mortar") business.  In the early 2000's, UMG made a decision to extend that treatment

3  to so-called "conditional" music downloads (described below), and UMG paid artists at the

4  licensed rate.  But at around the same time it reversed its previous course of performance and

5  created a distinction for so-called "permanent" downloads, on the pretext (since demonstrated to

6  be false) that its contracts with the permanent download providers were not licenses.[3]

7      17.     These legacy agreements were written this way, and this course of performance

8  developed, because of the differing economics of record sales by UMG as compared to its

9  licensing arrangements.  When UMG sells records, or tapes, or CDs, it has to incur the costs of

10  manufacturing, shipping and handling those physical products.  If UMG pays the artist 15% of

11  retail, while UMG sells the product at wholesale and incurs all the manufacturing and shipping

12  costs, then UMG has an opportunity to make a fair profit.  But when UMG licenses a third party to

13  exploit an artist's work, whether for a motion picture or television show, a compilation record, a

14  conditional or permanent download, or other usages, UMG has no manufacturing or shipping costs

15  (or other costs of any kind) and thus paying the artist 50% of the amount received from the

16  licensee still provides UMG with a fair profit.

17      18.     The licensing rate is not a windfall for the artists, since the amount received by

18  UMG from the licensee has factored into it expenses for manufacturing and related distribution

19  incurred by the licensee.  The amount paid to UMG is truly a licensing royalty, and sharing it

20  50/50 is actually generous to UMG.  Faced with diminished record sales because of internet piracy

21  and the like, however, UMG decided to change the rules of the game and pay artists a far lower

22

23  [3]  UMG tried, but largely failed, to extract substantial unallocated payments or fees from the

24  permanent download providers, often cast as consideration for use of UMG's "trademarks" or for
    reproduction of "album artwork" or for reimbursement of unspecified "marketing expenses."   In
    the case of Apple, UMG tried to capture a piece of Apple's iPod revenues.  (Apple said no.)

25  According to the public record, however, in the case of many of the providers of conditional
    downloads, UMG did extract such consideration, sometimes in the form of equity in those

26  companies.  None of that consideration made its way to UMG's artists.  Moreover, it is safe to
    assume that, in return for that consideration, UMG was far more amenable to a smaller recurring

27  royalty or fee payable to it (and allocable to its artists) from these providers for such uses,
    especially where it had acquired an ownership interest in its counter-party.

28

1  effective rate on permanent downloads, making those transactions super-profitable for UMG, and

2  recovering for it opportunities lost through the failure to create its own online music platform.

3       19.      As in the *F.B.T.* case, UMG has willfully violated those legacy agreements, as

4  written and as interpreted in its prior course of performance, through which UMG obtained

5  complete control over artists' recordings in exchange for the promise of payment to them for

6  various forms of exploitation.  The contracts included in the class definition below are largely

7  form contracts (with variations immaterial to the claims raised here) that contain licensing or

8  equivalent provisions as described below.  These licensing provisions are not typically negotiated

9  by the parties and are, in any event, governed by UMG's uniform course of performance and the

10  custom and practice described above.  UMG has breached these agreements by paying its artists a

11  fraction of the actual amount owed to them for its licensing of their recordings to Digital Content

12  Providers for permanent music downloads.[4]

13       20.      During the applicable Class Period, UMG has, in a widespread, calculated manner,

14  violated the royalty provisions of its recording and producing agreements with Plaintiffs and the

15  Class by (a) failing to make proper royalty payments to Plaintiffs and Class members and/or (b)

16  failing to properly credit Plaintiffs and Class members' royalty accounts, for the income derived

17  from its licenses with Digital Content Providers for permanent music downloads.

18       21.      The parties in the *F.B.T.* case have returned to the district court on remand from the

19  Ninth Circuit following a failed petition for writ of certiorari by UMG.  The plaintiffs in the *F.B.T.*

20  case have submitted a damages claim on this issue in the neighborhood of $4 million.  In response,

21  and likely in anticipation of its implications for the present case, UMG has gone to great lengths to

22  reset its position on the accounting and payment obligations it owes under the 50% licensing

23

24

---

25  [4]  Under its licensing agreements with Music Download Providers, UMG receives approximately
26  seventy percent (70%) of the retail price for every licensed, digital download sold, licensed or
   otherwise delivered by the Music Download Provider to an end user.  Under its licensing
27  agreements with Ringtone Providers, UMG receives approximately fifty percent (50%) of the
   retail sale price of every licensed, digital download sold, licensed or otherwise delivered by the
28  Ringtone Provider to an end user.

1   provision.  The *F.B.T.* plaintiffs responded with a motion to amend their complaint to allege that

2   UMG breached the implied covenant of good faith and fair dealing.

3       22.     In granting the *F.B.T.* plaintiffs' motion, the district court wrote: "Furthermore, the

4   Court is deeply troubled by [UMG's] argument.  [I]t is now quite apparent what [UMG] hope[d]

5   to gain by bamboozling the Court and [F.B.T.] on this issue.  [UMG's] current stance makes it

6   appear as though [it] carefully inserted the [damages] issue into the motion for summary judgment

7   before [it] notified F.B.T. or the Court of what percentage of the revenues from foreign sales of

8   permanent downloads and master-tones [about 10% of its receipts due to intra-company

9   allocations for so-called "distribution fees"] would be paid to F.B.T.  An attempt to dupe the Court

10  into a premature ruling will not serve as the basis to deny F.B.T. an opportunity to challenge

11  [these] accounting practices."

12      23.     As noted above, UMG justified its underpayment on these monies on the pretext

13  that the agreements between UMG and Digital Content Providers are not licenses, but rather are

14  sales agreements (sometimes misleadingly referred to by UMG as "resale agreements" and falsely

15  characterized to others in that fashion) legally indistinguishable from those UMG has with its

16  distributors that sell its CDs and other physical product in brick-and-mortar stores, and unlike the

17  license agreements UMG has with various third parties, including the providers who deliver

18  conditional music downloads.  The Ninth Circuit rejected the foregoing pretext as a matter of law

19  in the *F.B.T.* case.

20      24.     Nonetheless, immediately after the U.S. Supreme Court declined review, UMG

21  announced in a March 28, 2011 article appearing in the *New York Times* that the decision by the

22  Ninth Circuit in the *F.B.T.* case did "not create any legal precedent" and that, in substance, it did

23  not intend to alter any of its current policies or practices as they relate to the accounting for and

24  payment on such income, or to acknowledge past due amounts to their royalty participants for this

25  income.  In other words, the rule of law did not apply to UMG.

26      25.     UMG's conduct has substantial monetary consequences for members of the Class.

27  A reasonable rule of thumb is that for every dollar UMG actually accounts for and pays or credits

28

these artists for permanent music download income, it should be accounting for and paying or crediting anywhere between *two and three* (or more in the case of Motown legacy artists) dollars.

26.     UMG has systematically violated its obligations to Plaintiffs and other members of the Class to make proper payments to them and to properly credit their royalty accounts. Moreover, in conjunction with the other conduct alleged herein, UMG has done so in a manner that violates the unfair competition laws of various states.  As a consequence of UMG's past and continuing contractual and statutory violations, Plaintiffs and the other members of the Class have been damaged through the loss of monies that UMG has retained for its own benefit.

27.     A record label like UMG requires no charter or certificate unique to it from any governmental agency to do business.  This lack of regulation means that the recorded music industry also has no regular (sworn) public reporting requirements relating to its policies or practices in relation to its artists.  *Cf.* California Talent Agencies Act, Labor Code § 1700, et seq. (requiring licensing of talent agencies, overview of contractual relationships, and strict reporting obligations).  This puts artists at a distinct disadvantage when exercising their rights to accurate and complete royalty accountings.  Clover, *Accounting Accountability:  Should Record Labels Have a Fiduciary Duty to Report Accurate Royalties to Recording Artists*, 23 Loyola L.A. Ent. L. Rev. 395 (2003).  Indeed, following extended investigation and public hearing, the California State Senate Select Committee on the Entertainment Industry cautioned the major record companies, including UMG, against engaging in policies and practices that constitute "purposeful neglect" of their royalty participants.  See Note: *California's Recording Industry Accounting Practices Act, SB 1034: New Auditing Rights for Artists*, 20 Berkeley Tech. L.J. 933 (2005).

28.     Before violating its obligations to its artists, UMG vetted the policies and practices at issue in this case at its highest corporate levels.  It sought to enlist the Digital Content Providers in an effort to mischaracterize its dealings with them to facilitate its conduct toward its artists. Thereafter, as described above, it carried forward its deception in the treatment of the licensing income at issue in this case by employing an opaque and artificial method for accounting for and paying its artists for their share of this income.  At the same time, UMG engaged in a sustained

public relations effort designed to convince the public that it had employed "groundbreaking" and "enlightened" accounting practices that actually benefitted (rather than cheated) the Class, repeatedly making public statements characterizing its agreements with Digital Content Providers as "resale" agreements.  It continued to make such statements even *after* the Ninth Circuit's decision in the *F.B.T.* case.

29.     In addition to the foregoing, Plaintiffs are informed and believe that UMG (a) commissioned, either on its own initiative or with the support of the U.S. music industry's principal trade organization, so-called "white papers" on the issue; (b) analyzed internally the financial consequences of its misconduct; and (c) employed and continues to employ a host of unfair tactics and strategies in its dealings with artists (including by keeping its agreements with the Digital Content Providers under lock and key and away from interested parties as well as by implementing other protocols relating to audits by artists of their royalty accounts) to minimize its exposure from the unlawful conduct at issue here, all of which were also subject to consideration, review and approval by and among the highest placed officers and directors of UMG.

30.     Plaintiffs seek monetary damages, injunctive, and/or declaratory relief against UMG for themselves and the Class, as well as an accounting and judgment declaring the proper method of calculating payments of royalties or crediting royalty accounts with respect to the licensing of their recorded music to third-party Digital Content Providers.  Furthermore, Plaintiffs request that this Court order UMG to adhere to the proper methodology for calculation of such royalties in the future.

### III.     THE PARTIES

**A.     Plaintiffs**

### Rick James

31.     Plaintiff James Ambrose Johnson, Jr. 1999 Trust was established as a living trust organized and subsisting under the laws of the State of California, and presently owns as successor in interest to any relevant party all intellectual property developed and owned by the singer,

songwriter, musician, producer and performer James Ambrose Johnson, Jr., an individual better known to the public as Rick James.  James died in August of 2004 in the State of California.

32.     Over the course of a decades-long career, James earned multiple gold, platinum and multi-platinum record awards and chart-topping singles (scoring four #1's on the U.S. R&B chart, including the smash hits "Superfreak" and "Give It To Me Baby"), in becoming one of the foremost artists working in the funk/R&B and soul genres of the music industry during the 1970's and 1980's.  Among other things, he is credited with "rescuing" Motown Records (now a part of UMG) during that period by providing hits (performed and recorded by himself and others, including The Temptations, The Mary Jane Girls, Eddie Murphy, Teena Marie and Smokey Robinson), which he wrote and produced that updated the label's style and renewed its profitability and stature.  In addition to his lasting reputation as a funk music provocateur, which is legendary, James' body of recorded music as both a recording artist and music producer remains of enduring quality, critical and cultural importance, and significant commercial value.

### Chuck D – Public Enemy

33.     Plaintiff Carlton Douglas Ridenhour, d/b/a "Chuck D," is a musician, songwriter, recording artist, and performing artist who resides in the State of California.

34.     Chuck D is best known as one of the founding members of the hip-hop group Public Enemy.  Public Enemy's style has been described by music critics as containing "elements of free jazz, hard funk, even musique concrete. . .creating a dense, ferocious sound unlike anything that came before."  In 2004, *Rolling Stone* ranked Public Enemy #44 on its list of the "Immortals: 100 Greatest Artists of All Time."  Best known for politically-charged hits, which were numerous, Public Enemy's "Fight the Power" was named the greatest hip-hop song of all time by VH-1.

### Dave Mason

35.     Plaintiff Dave Mason is a musician, singer, songwriter, recording artist, and producer who first found fame as an original member of the band Traffic.  Among other things, he was responsible for writing one of that band's best known and biggest hit songs, "Feeling Alright."  Mason, an individual currently residing in the State of California, went on to achieve

solo success with his debut record, *Alone Together*, released in 1970 by Blue Thumb Records (subsequently acquired by UMG).  Later records on that label included *Dave Mason & Cass Elliot*, released in 1971, and *Headkeeper*, released in 1972.

36.     Over the course of his decades-long career, Mason has performed and recorded with such legendary artists as Jimi Hendrix, Michael Jackson, The Rolling Stones, Eric Clapton, George Harrison, Fleetwood Mac, Leon Russell, Jim Capaldi, and Rita Coolidge.  Mason was admitted to the Rock-and-Roll Hall of Fame as a founding member of Traffic in 2004.

## Whitesnake

37.     Plaintiff Whitesnake is a rock band founded in 1977 by David Coverdale, who remains the lead singer and sole principal of Whitesnake today.  Whitesnake Productions (Overseas) Ltd. is Coverdale's production entity, in which Coverdale is the sole owner and principal.

38.     Whitesnake released multiple studio records on Geffen Records (subsequently acquired by UMG).  These included *Slide It In* (released in 1984*), Whitesnake* (released in 1987), and *Slip of the Tongue* (released in 1989), among others.  Over the band's decades-long run, headed by Coverdale, it achieved, and continues to achieve, enormous commercial success, selling in excess of 40 million records worldwide.

## Otis Williams and Ron Tyson – The Temptations

39.     Plaintiff Otis Williams is a musician, recording artist, and performing artist who resides in the State of California.

40.     Plaintiff Ron Tyson is a musician, recording artist, and performing artist who resides in the State of California.

41.     Together, Williams and Tyson comprise the musical group "The Temptations." The Temptations, a group that has a long history, were inducted into the Rock-and-Roll Hall of Fame in 1989. Among other songs, the band has released a slew of legendary hits, including "My Girl," "Get Ready," "Ain't Too Proud to Beg," "The Way You Do the Things You Do," "Cloud Nine," "I Can't Get Next to You," "Just My Imagination" and "Papa Was a Rollin' Stone."  The

1  Temptations have had four Billboard Hot 100 number-one singles and 14 Billboard R&B number-

2  one singles, and have won four Grammy Awards.

3  **"Bo" Donaldson**

4  42.   Plaintiff Robert Walter "Bo" Donaldson is a musician, recording artist, and

5  performing artist who resides in the State of California.

6  43.   Bo Donaldson is the founder of the musical group "Bo Donaldson and the

7  Heywoods," best known for such hit songs as the 1974 number one hit "Billy Don't be  Hero" and

8  numerous other 1970's top 40 hits including "Who Do You Think You Are," "The Heartbreak

9  Kid," and "Our Last Song Together."  The band continues to maintain an active touring schedule.

10  **Black Sheep**

11  44.   Plaintiff William McLean, a/k/a "Will McLean" and p/k/a "Mista Lawnge," is a

12  musician, songwriter, recording artist, and performing artist who resides in the State of Florida.

13  45.   Plaintiff Andres Titus, p/k/a "Dres," is a musician, songwriter, recording artist, and

14  performing artist who resides in the State of New York.

15  46.   Will McLean and Andres Titus are together best known as the two founding

16  members of the hip-hop group Black Sheep.  Black Sheep debuted in 1991 on Polygram Records

17  with the hit song "Flavor of the Month" and later released its first album, *A Wolf in Sheep's*

18  *Clothing*, gaining the group praise and recognition in the hip-hop community for the album's

19  unique rhythms and intelligent lyrics.  That album charted on the Billboard Hot Dance Music/Club

20  Play chart in 1992 with "The Choice is Yours (Revisited)" (#9) and "Strobelite Honey" (#1).  In

21  2008, the single "The Choice is Yours (Revisited)" was ranked #73 on VH-1's 100 Greatest Hip

22  Hop Songs.

23  **B.   Defendant**

24  47.   Defendant UMG is a Delaware corporation with its headquarters in the State of

25  California. At all relevant times, UMG was and continues to be in the business of exploiting the

26  sound recordings of musical performances and the audio-visual recordings of such performances.

27

28

1  UMG's exploitation includes, but is not limited to, producing, manufacturing, distributing,

2  licensing, and selling these recordings.

3      48.    UMG holds, and exploits, one of the largest collections of recorded music in the

4  world.  UMG's catalog includes some of the best selling artists of the 20th Century, including

5  many legacy artists who are members of the Class.  Its twelve major divisions or labels

6  (enumerated above) are subdivided into at least 33 smaller divisions or labels.

7                  **III.**      **JURISDICTION AND VENUE**

8      49.    Jurisdiction exists in this Court pursuant to the Class Action Fairness Act, 28

9  U.S.C. § 1332(d)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a) & (c).

10                  **IV.**      **SUBSTANTIVE ALLEGATIONS**

11      **A.**    **Music Download Services**

12      50.    Beginning in 1999, a new and viable method of commercial exploitation of

13  recorded music, music download services ("Music Download Services"), was developed and has

14  since seen widespread implementation in the marketplace.  Music Download Providers offer

15  Music Download Services.  It is an adjudicated fact that these companies (when conducting

16  business lawfully) have obtained licenses from UMG authorizing these companies to deliver, via

17  digital downloads, its catalog of sound recordings.

18      51.    "Music Download Services" allow consumers, for a fee, to download digital

19  versions of recorded music directly to their computers or other electronic storage devices ("Music

20  Downloads"). There is no physical or tangible product, no packaging, and therefore no breakage,

21  "free" goods, or returns.  However, Music Downloads often embody various restrictions to

22  prevent the consumer from copying and/or sharing the Music Download with others. Often, these

23  restrictions are announced in accompanying "terms of use" and are enforced through a Digital

24  Rights Management system ("DRM") that encrypts the content.

25      52.    To allow users to lawfully obtain digital copies of the recordings owned or

26  controlled by record labels, Music Download Providers have obtained licenses with UMG and

27  other record labels.  The Music Download Providers could not make deals directly with artists

28

under contract, since those contracts uniformly give UMG complete control over the artists'
works.  Depending on the license, Music Download Providers generally charge either: (a) a flat,
per-download fee (sometimes known and referred to by UMG as "permanent" downloads); or (b)
a monthly subscription fee (sometimes known and referred to by UMG as "conditional"
downloads).  In either event, the consumer does not "own" anything at the conclusion of the
transaction; rather, he or she has a right to access and play the recorded music on a device.

53.     When Apple launched its online business, called iTunes, in April of 2003, and
offered "legal" downloads for, on average, 99¢ per track or $9.99 per album, the popularity of
Music Downloads began to grow exponentially.  On October 4, 2011, total music downloads from
iTunes reached 16 billion tracks.  Today, iTunes accounts for over 75% of all Music Downloads.
According to publicly-available sources, iTunes generated $1.4 billion in revenue for Apple in the
second quarter of 2011, up from $1.1 billion in the second quarter of 2010.

54.     In addition to Apple, many other Music Download Providers have signed licenses
with UMG to offer Music Downloads to consumers.  These providers include, but are not limited
to, Amazon.com, Buy.com, Liquid Digital Media (walmart.com), Napster, Rhapsody, Microsoft's
Zune Marketplace, and eMusic. In fact, the International Federation of the Phonographic Industry
("IFPI"), a worldwide representative of the recorded music industry, estimates that by 2010 record
labels had "licensed" roughly 13 million tracks of music to over 400 Music Download Providers.

55.     Licensing of recordings to Music Download Providers has become highly lucrative
for record labels like UMG.  It is estimated that the licensing of recordings generated $4.6 billion
in worldwide revenue for record labels, or roughly 29% of their total revenue, in 2010 alone.

56.     UMG is the largest of the "Big 4" group of record labels (UMG, EMI Music,
Warner Music Group, and Sony-BMG Music Entertainment). These labels license approximately
80% of the Music Downloads to Music Download Providers.  Nielsen Soundscan estimates that
UMG controls roughly 32% of the market for all digital downloads in the U.S.[5]

[5]  UMG's market share is about to become a third as large again, as it is on the cusp of acquiring
EMI Music, one of the other three major labels, with about 10% of the worldwide market in
recorded music, including downloads.

CONSOLIDATED CLASS ACTION COMPLAINT      -15-
– Case No. CV-11-1613 (SI)

57.     Music Download Providers have obtained licenses from UMG that authorize these providers to deliver, via digital downloads, UMG's catalog of recordings, including Plaintiff's recordings as described herein.  Under its licenses with Music Download Providers, UMG does not manufacture or warehouse any physical product or create any packaging, nor does it ship or sell any product to stores or other distribution points, and faces no inventory risk or risk of breakage or return of unsold product.

58.     The prevalence of Music Downloads via Music Download Providers means that UMG's continued and improper accounting of monies owed to Plaintiffs and Class members has deprived them of hundreds of millions of dollars during the Class Period, and more into the future.

**B.      Mobile Phone Ringtones**

59.     Ringtones (also known as mastertones) are a portion or clip of an artist's actual sound recording (rather than an electronic reproduction, e.g., MIDI) played on a mobile phone when someone is calling, texting, or otherwise trying to contact the mobile phone owner.

60.     Ringtones are delivered to consumers by "Ringtone Providers."  They range in price between $1.00 and $3.00 per ringtone. Ringtone Providers include, but are not limited to, mobile phone companies (including, but not limited to, AT&T, Verizon, Sprint, and T-Mobile), content owners (including, but not limited to MTV and VH1), and third-party aggregators (including, but not limited to, Zed, Hudson Soft, Jamster and iTunes).  In general, consumers obtain and download Ringtones directly from their mobile phones.

61.     To deliver Ringtones to consumers, Ringtone Providers have entered into license agreements with UMG and other record labels authorizing them to use those labels' recordings to produce ringtones for consumers.  Record labels have made billions of dollars from their licensing agreements with Ringtone Providers. Globally, ringtone revenues reached roughly $4 billion in 2004.  In the U.S., those revenues reached $714 million in 2007, and were $541 million in 2008.

62.     Ringtone Providers continue to deliver ringtones to consumers and to enter into licenses with record labels.  Apple entered into a license agreement with record labels that enabled

1  them to distribute ringtones in around September 2009.  Currently, ringtones are available on

2  iTunes for between 0.99¢ and $1.29 per download.

3       63.    Ringtones continue to play an important role in record labels' revenue stream as

4  well.  The Recording Industry Association of America ("RIAA") has added its Gold and Platinum

5  recognition program to ringtone sales. In 2006, the RIAA awarded Gold Status (500,000

6  downloads) to 84 ringtones, Platinum Status (1,000,000 downloads) to 40 ringtones, and Multi-

7  Platinum Status (increments of 1,000,000 downloads over 1,000,000 downloads) to four ringtones.

8       64.    Under its licenses with Ringtone Providers, UMG does not manufacture or

9  warehouse any physical product or create any packaging, nor does it ship or sell any product to

10  stores or other distribution points, and faces no inventory risk or risk of breakage or return of

11  unsold product.  Rather, UMG licenses its catalog of recordings to Ringtone Providers for delivery

12  by them via digital download to consumers.

13       65.    The lucrative revenues generated on ringtones means that UMG's continued

14  improper accounting of monies owed to Plaintiff and Class members has deprived Plaintiff and the

15  Class of tens of millions of dollars in royalties.  Pursuant to the Ninth Circuit's ruling in the *F.B.T.*

16  case, the agreements between Digital Content Providers and UMG that allow these providers to

17  distribute UMG's recordings through permanent downloads are "licenses" and should be treated as

18  such.

19       **C.**    **UMG's Recording Artist and Producer Agreements**

20       66.    UMG and its predecessors in interest have entered into recording and producing

21  agreements with artists (including Plaintiffs) compromising the Class whose recorded

22  performances UMG intended to commercially exploit.  Under these agreements, the artists

23  promised to make certain recordings for UMG and to deliver those recordings so that UMG could

24  engage in their exclusive commercial exploitation.  In return, UMG promised to pay the artists

25  certain royalties on various exploitations.

26       67.    As a general proposition, these agreements govern, among other things, the

27  payment of royalties to artists for the sale and licensing of their recordings by UMG in the

28

following manner:  When the artists' recordings are exploited by UMG, the artists are entitled to the payment of royalties as either (a) actual payments or (b) credits against advances paid by UMG to or on behalf of the artist until such advances are recouped, after which time UMG is required to pay royalties to the artist.

68.    Also, as a general proposition, these agreements provide, among other things, that UMG shall:  (a) provide certain financial benefits to the artists, and (b) furnish semi-annual accounting statements setting forth an accurate and complete computation of monies due for the sale or license of their recordings, accompanied by any payments due.  The foregoing benefits are computed electronically through software programs that UMG controls and maintains; based upon the data UMG is responsible for inputting, the foregoing statements are generated by those programs.  Thus, the ability to calculate the amount owed to Plaintiffs and Class members for the underpayment of permanent downloads is a matter of simple calculations through adjustment of the inputs to these software programs.

**D.    The James Agreement**

69.    On or about July 18, 1977, and again on or about January 1, 1979, Rick James (individually and later through a so-called "loan-out" entity owned and controlled by him) entered into a recording artist and producer agreement with Motown Record Corporation ("Motown"), later acquired by UMG.  All or substantially all of the recorded music in issue between James and UMG is governed by the 1979 agreement.  The 1977 agreement and 1979 agreement shall be referred to collectively as the "James Agreement."

70.    The James Agreement provides that Motown "will pay" James what it defines as a "Licensed Rate" of Motown's "net receipts based on actual sales" of "records sold by [Motown]'s licensees."  The pertinent provision reads more fully as follows:

> With respect to records sold by [Motown]'s licensees, including licensed record clubs, either within or outside the United States, [Motown] will pay to [James] a royalty equal to fifty percent (50%) (less the percentage, if any, payable to an Outside Producer) of [Motown]'s net receipts based on actual sales (as shown on statements furnished to [Motown] by such licensees and actually

> paid or credited against advances and less any inclusion of A.F.of M. payments if actually paid) and shall be computed in the national currency of the country of manufacture or sale, as [Motown] is paid, at the rate of exchange in effect at the time of payment or credit to [Motown], and shall not accrue until payment or credit has been received by [Motown] in the United States; provided if the licensed company is an affiliate, subsidiary or commonly owned, then payment is deemed to accrue to [James] when payment is received by that licensee.

71.     "Records sold" and "sales," as defined in the James Agreement, mean "those records shipped by [Motown] (or on their behalf) hereunder which are paid for and not returned or exchanged."

**E.      The Public Enemy Agreement**

72.     On or about September 15, 1986, Ridenhour, William J. Drayton (also known as "Flavor Flav"), and later, James Boxley, together known and performing as "Public Enemy," entered into a recording artist agreement with Def Jam Recordings, later acquired by UMG.  The 1986 agreement was amended by the parties twice, first in 1992 and then in 1998.  The 1986 agreement, as amended, shall be referred to as the "Public Enemy Agreement."

73.     In or around 1998, UMG acquired Def Jam. As a result, UMG assumed Def Jam's contractual obligations under the 1986 and 1992 Agreements and acquired the rights to the recordings for the following seven Public Enemy albums:  (a) *Yo! Bum Rush the Show* (Def Jam - 1987);  (b) *It Takes a Nation of Millions to Hold Us Back* (Def Jam - 1988); (c) *Fear of a Black Planet* (Def Jam - 1990); (d) *Apocalypse 9. . .The Enemy Strikes Back* (Def Jam - 1991); (e) *Greatest Misses* (Def Jam - 1992); (f) *Muse Sick-n-Hour Mess Age* (Polygram - 1994); and (g) *He Got Game* (Def Jam – 1998).

74.     The pertinent provision of the Public Enemy Agreement reads as follows:

> In respect of any Master Recording leased by Def Jam to others for their distribution of Phonograph Records in the United States, Def Jam will pay you fifty percent (50%) of Def Jam's net receipts from its Licensee.

### F.   The Mason Agreement

75.     On or about November 13, 1969, Mason entered into an agreement with Blue Thumb Records.  This agreement is referred to herein as the "Mason Agreement."  UMG subsequently acquired Blue Thumb, thereby assuming all of Blue Thumb's contractual obligations, including the Mason Agreement.

76.     The Mason Agreement governs, among other things, the payment of royalties to Mason for the sale and licensing of the sound recordings delivered by him to Blue Thumb.  The Mason Agreement provides that Blue Thumb "shall pay" Mason 50% of net royalties derived from licensing of MASON'S master recordings.  The pertinent provision reads as follows:

> Notwithstanding anything to the contrary contained herein, Company shall pay Artist an aggregate of fifty (50%) percent of the net royalties received by Company from the licensing of the use of master recordings of Artist's performances made hereunder with respect to records sold anywhere in the world through any record club or other direct sales to consumer operation.

### G.   The Whitesnake Agreement

77.     On or about September 17, 1982, Coverdale, by and for the entity Whitesnake Productions (Overseas) Ltd. , entered into an agreement with The David Geffen Company ("Geffen").  This agreement is referred to as the "Whitesnake Agreement."   UMG later acquired Geffen, thereby assuming all of Geffen's contractual obligations, including the Whitesnake Agreement.

78.     The Whitesnake Agreement governs, among other things, the payment of royalties to Whitesnake for the sale and licensing of the sound recordings delivered by Coverdale to Geffen.  The Whitesnake Agreement provides that Geffen "shall credit" Whitesnake 50% of net royalties derived from licensing of Whitesnake's master recordings.  The pertinent provision reads as follows:

> Company may license or sell Masters for phonograph record use or for any other type of use on a flat fee or cent rate basis, in which event, in lieu of any other payment due hereunder, Company shall credit Producer's royalty account with fifty percent (50%) of the net royalties actually received by Company.  Company shall only license Masters as aforesaid on bona-fide commercial terms.

## H. The Temptations Agreement

79.     On or about May 31, 1987, and again on or about December 15, 1993, The Temptations entered into an agreement with Motown, later acquired by UMG.  The 1987 agreement and 1993 agreement shall be referred to collectively as the "Temptations Agreement." Under the Temptations Agreement, the royalty to be paid on licenses is 50% of net receipts.

80.     Pursuant to that agreement, the royalties payable to The Temptations differ and are dependent on whether UMG has sold or licensed the band's recordings.  The Temptations Agreement provides that the band's "Licensed Rate equals fifty percent (50%) of Company's net receipts."  The pertinent provision reads as follows:

> With respect to the following Records and/or exploitation of Masters recorded hereunder, the royalty hereunder shall be a sum equal to fifty percent (50%) of Motown's net receipts with respect to such exploitation: (a) Records derived from Masters recorded hereunder sold through record clubs or similar sales plans; (b) licenses of Masters recorded hereunder for methods of distribution such as "key outlet marketing" (distribution through retail fulfillment centers in conjunction with special advertisements on radio or television), direct mail, mail order, or by any combination of the methods set forth above or other methods; (c) direct mail or mail order marketed by Motown itself; and (d) licenses of Masters recorded hereunder for distribution other than through Normal Retail Channels (e.g. movie soundtrack albums) or other than by the distributor who normally distributes Motown Records or Records hereunder in the territory concerned.

## I. The Bo Donaldson Agreement

81.     On or about September 21, 1973, Bo Donaldson, together with several others, professionally known as "Bo Donaldson and the Heywoods" (the "Heywoods"), entered into an agreement with ABC Records, Inc. ("ABC") (the "Donaldson Agreement").  UMG later acquired ABC, thereby assuming all of ABC's contractual obligations, including the Donaldson Agreement.

82.     The Donaldson Agreement governs, among other things, the payment of royalties for the sale and licensing of the recordings delivered by the Heywoods to ABC.  The Donaldson Agreement provides that ABC "shall credit" Bo Donaldson's royalty account with 50% of the amount received by ABC for the licensing of his recordings.  The pertinent provision of the Donaldson Agreement reads as follows:

> Without limiting any of the other provisions of this contract, and in addition to all of our other rights hereunder, we shall have the right to license recordings to other parties (a) for phonograph record use on a flat fee basis (as opposed to the royalty basis referred to in Paragraph 3 hereof) and (b) for all other types of use (visual and non-visual), on a flat fee or royalty basis. We shall credit your royalty account with Fifty Percent (50%) of the amount received by us under each such license, after we have paid what we are obligated to pay to the producer of such recordings.

### J.    The Black Sheep Agreement

83.    On or about July 5, 1991, William McLean and Andres Titus, jointly professionally known as "Black Sheep," entered into an agreement with Polygram Records, Inc. ("PRI") (the "Black Sheep Agreement?").  UMG later acquired PRI, thereby assuming all of PRI's contractual obligations, including the Black Sheep Agreement.

84.    The Black Sheep Agreement governs, among other things, the payment of royalties to Black Sheep for the sale and licensing of the sound recordings delivered by Black Sheep to PRI. The Black Sheep Agreement provides that the royalty to be credited to Black Sheep's account "shall" be fifty percent (50%) of PRI's net receipts derived from licensing of Black Sheep's recordings.  The pertinent provision of the Black Sheep Agreement reads as follows:

> With respect to the following Records and/or exploitation of Master Recordings, the royalty to be accrued hereunder shall be a sum equal to fifty percent (50%) of PRI's net receipts with respect to such exploitation: . . . (ii) licenses of Master Recordings to Non-Affiliated Third Parties for sales of Records by such licensees through. . .other methods; (iii) licenses of Master Recordings on a flat-fee or other royalty basis. . .(vi) any use(s) or exploitation(s) of Master Recordings not otherwise specified herein.

### K.    The Economics of Licensing and Sales in the Music Industry

85.    As noted above, UMG's recording and producing agreements provide that where UMG licenses recordings to third parties for the third party's exploitation of those recordings, UMG will pay the artist a percentage of its net receipts from the third party.  This figure is almost always substantially greater than the rate used to pay artists on traditional "brick and mortar" sales by UMG or its distributors.  Such a licensing provision was virtually never the subject of negotiation between the parties; it was a standard provision, both in form and almost always in amount.

86.     UMG's insistence in the *F.B.T.* case that its contracts with the Digital Content Providers for permanent downloads were not licenses, and its unfair practices of paying much lower "record sold" rates to artists for those downloads, must be understood against the backdrop of the economics of the recorded music industry.  The traditional recorded music business model relied upon enormous physical distribution chains that included record and CD manufacturing plants, warehousing facilities, and cargo vehicles for delivering physical goods to "brick-and-mortar" retail stores.  The largest record labels, like UMG, controlled both the production and distribution of recorded music, and consequently influenced most of the industry's value chain.

87.     Critical to that value chain was the ability of the record label to manufacture and distribute large quantities of physical product at any given moment and in a relatively short period of time – an unexpected "smash" or "hit" record required quick replenishment of inventories in countless retail outlets all at once.  In that economic structure, paying artists 10-15% of the retail sales price of each record or CD gave the label a shot at a good profit so that its business remained viable, as the label paid all the costs of manufacturing and distributing such records.

88.     With a licensing transaction, the economics are dramatically different.  All of the production and distribution and most of the marketing costs are borne by the licensee rather than the label.  Thall, *What They'll Never Tell You about the Music Business*, 30, 44-46 (2d ed. 2006).  For example, a movie studio that licenses a song for a sound track traditionally bears the cost of mixing the song, syncing it to the film or sequencing it on a soundtrack album, and distributing and marketing the film or soundtrack album to the public.  UMG, as licensor, merely provides a copy of the sound recording (and sometimes not even that) and permission to use the track.

89.     Similarly, if UMG licenses another company to create records or CDs from an artist's work, again, UMG's costs are virtually zero.  This is the main reason artists' participation in licensing income is almost always higher on a percentage basis than their participation in record sale income: The labels take almost no risk and have almost no costs to recoup, yet still profit substantially from the artists' creative works.

90.     This basic arrangement in the artist-label relationship does not create a windfall for artists.  As the costs associated with the license are borne by the licensee, and therefore calculated into what it will pay UMG for the license, artists get a larger share of a smaller amount – *i.e.*, the label's net receipts rather than the retail price of the product.  Under UMG's approach to permanent downloads, however, artists end up getting a smaller share of a smaller amount, and UMG gets a windfall.

91.     Permanent downloads similarly render physical distribution and its associated costs unnecessary.  One electronic copy is transmitted to Apple or its competitors and it undertakes whatever expense is incurred in delivering "copies" to consumers.  Indeed, the Ninth Circuit already made this factual finding in the *F.B.T.* case.  As a result, as with other licensed uses, the fixed costs associated with producing the master recording are the main if not sole costs.  There are no manufacturing or distribution costs, no inventory or returned product risk, nor any cost of goods sold attributable to UMG.

92.     On the supply side, Music Download Providers like Apple run the computing resources, the internet connections and the platform for distribution and marketing.  On the demand side, consumers provide the computing resources for storing, rendering and playing the music, as well as their own internet connections to download the music.

### L.   UMG Has Licensed its Recordings to Digital Download Services

93.     UMG has entered into contracts with Digital Content Providers that allow these providers to distribute via permanent download all or some of UMG's catalog of recordings to end-users. In exchange, these Providers generally pay UMG a flat rate or fixed percentage per download (typically $0.70 on a $0.99 download).

94.     As discussed herein, UMG's agreements with these Digital Content Providers qualify as licenses.  At all relevant times, as discussed below, UMG knew as much.  As such, UMG was and is required to pay Plaintiffs and the Class members at the "licensed rate" on its net receipts from these Digital Content Providers, just as it had previously done.

**M.   UMG Adopted a Deceptive Corporate Policy to Avoid Paying Its Artists**

95.      In breach of its obligations to its artists, UMG treated its transactions with Digital Content Providers as something other than licenses.  The policy to do so was a UMG corporate-wide decision made at the highest executive level.  This policy was expressed in a 2002 memorandum from Michael Ostroff, UMG's Executive Vice-President of Business & Legal Affairs at the time, which (according to pleadings in the *F.B.T.* case) reflected "a company-wide decision to pay royalties for permanent downloads reproduced and distributed by third party providers under the royalty provision applicable to defendants' sales of physical product, as opposed to under the Master License provision in artist contracts" that applied to existing form recording and producing agreements.  UMG contends that the internal discussion conducted around that decision is attorney-client privileged.

96.      UMG enlisted Apple and other Digital Content Providers to assist in implementing this policy, engaging in various linguistic contortions in drafting its contracts with these Providers. Among other things, UMG's attorneys attempted to delete any reference to "license" in these contracts, and then announced that these agreements were resale arrangements as a fait accompli to the artist community at large.  UMG carried over this fiction into its accountings to its artists, which deliberately miscategorized and misrepresented the nature of permanent download income to them, as described above.

97.      By insisting to the world that its dealings with Digital Content Providers were not licenses, UMG intended to, and did, avoid treating the income derived from those arrangements as licensing income, and avoided paying on its net receipts for what became a fast-growing share of the music market.  The result in almost every instance was a deprivation of the artists' reasonable expectancy, especially given UMG's prior course of performance and industry custom and practice, and an enormous and unjustified windfall to UMG.

98.      Importantly, UMG's course of performance regarding the treatment of download licensing income is *not* tethered to the specific contractual language of its recording and producer agreements.  Thus, according to its testimony in the *F.B.T.* case, UMG pays all its artists across

the board at the licensing rate for "conditional downloads and for limited downloads."  As reflected in the testimony adduced in the *F.B.T.* case, it does so as a matter of *policy* and not as a matter of *contract*.

99.      The ordinary meaning of a license is the "permission to act," *Webster's Third New International Dictionary of the English Language* 1304 (2002), while a sale is (a) an actual transfer of title in a copy of the work, or (b) the passing of all exclusive, intellectual property rights in a work. See 17 U.S.C. § 109 (describing (a)); *Quality King Distribs. v. L'anza Research Int'l*, 523 U.S. 135, 145 (1998) (describing (b)).

100.      Based on the ordinary meanings of "license" and "sale," the Ninth Circuit found in the *F.B.T.* case that the record labels "did not 'sell' anything to the download distributors. The download distributors did not obtain title to the digital files. The ownership of those files remained with the label, which reserved the right to regain possession of the files at anytime, and the label obtained recurring benefits in the form of payments based on the volume of downloads."

101.      Under the first sale doctrine, after the first sale of a legally copyrighted work, the copyright holder no longer has a right to restrict or prevent subsequent sale of her work. Thus, purchasers are free to resell lawfully purchased CDs and other physical music products without obtaining the copyright holder's approval.  The U.S. Copyright Office, however, has declined to extend this doctrine to the foregoing digital media, concluding that these types of transactions are not "sales" but rather "licenses."  The major record labels, including UMG, have supported the U.S. Copyright Office in that decision.

102.      Steve Jobs, the late CEO of Apple, knew that UMG's policy of characterizing its dealings with Apple were "sales" rather than "licenses" was misleading.  In his February 2, 2007 "Thoughts on Music" published on Apple's website, Jobs stated: "Since Apple does not own or control any music itself, it must *license* the rights to distribute music from others, primarily the 'big four' music companies: Universal, Sony BMG, Warner and EMI.  These four companies control the distribution of over 70% of the world's music. When Apple approached these companies to *license* their music to distribute legally over the Internet, they were extremely

1   cautious and required Apple to protect their music from being illegally copied."  (Emphasis

2   added.)

3       103.    Apple's iTunes Terms of Service states that "Apple *and its licensors* reserve the

4   right to change, suspend, remove, or disable access to any iTunes products, content, or other

5   materials." (Emphasis added).  Thus, Apple has explicitly acknowledged that it licenses content

6   from third parties such as UMG.

7       104.    The misleading and deceptive nature of UMG's policy was also reflected in

8   Congressional testimony given in 2008 by Jeffrey Harleston, now the Senior-Vice President for

9   Business & Legal Affairs for UMG, and UMG's expert witness in the *F.B.T.* case.  Harleston

10  testified on July 29, 2008 before the Judiciary Committee of the United States Senate in which he

11  stated: "For example, at Geffen records [a sub-label of UMG] we *license* the use of our recordings

12  to hundreds of companies, from Amazon.com, MTV, MySpace and Verizon, to television

13  programs like 'Grey's Anatomy' to retail outlets like Wal-Mart, to video games, toys,

14  toothbrushes and greeting cards. What is important is that the negotiation of the *license* in each

15  instance takes into account the market considerations. For example, *a license of a recording for a*

16  *toothbrush will have a different fee than the license of the same recording when it is selected on*

17  *demand and downloaded to an iPod. Thus, the actual price each licensor pays can be very*

18  *differen*t." (Emphasis added.)

19      105.    Prior to the Ostroff Memo, and before the advent of iTunes, UMG routinely entered

20  into licenses with Digital Content Providers for the delivery of permanent downloads, and treated

21  the income derived from those licenses accordingly, paying the licensing rate to artists on such

22  income.  On royalty accounting statements to its artists from that time period, UMG showed the

23  income derived from this arrangement under "License" and paid artists at the licensing rate.

24                        **V.    CLASS ACTION ALLEGATIONS**

25      106.    Plaintiffs bring this class action pursuant to Federal Rules of Civil Procedure 23(a)

26  and 23(b) on their own behalf and on behalf of:

27          All persons and entities who entered into UMG (including its label and affiliates as
            described above) production or recording agreements from January 1, 1965 to April

28

30, 2004 and who, along with their agents, successors in interest, assigns, heirs, executors and administrators, received royalties on, or financial credits or adjustments for, income received by UMG from Digital Content Providers at a rate less than the rate provided for licensing income in their contracts with UMG (hereinafter, the "Class").

107.    The following Persons shall be excluded from the Class: (1) UMG and its subsidiaries, affiliates, officers and employees; (2) all persons who make a timely election to be excluded from the proposed Class; (3) governmental entities; and (4) the judge(s) to whom this case is assigned and any immediate family members thereof.

108.    Plaintiffs reserve the right to re-define the Class prior to certification.

109.    The Class for whose benefit this action is brought is so numerous that joinder of all Class members is impracticable. While Plaintiffs do not presently know the exact number of Class members, Plaintiffs are informed and believe that there are thousands of Class members, and that those Class members can only be determined and identified through Defendant's files and, if necessary, other appropriate discovery.

110.    There are questions of law and fact which are common to Class members and which predominate over any questions affecting only individual members of the Class. These common questions include:

(a)    Whether UMG violated its recording and producing agreements by, *inter alia*, mischaracterizing the money it received from Digital Content Providers as "sales" income rather than "license" income in violation of the recording and producing agreements;

(b)    Whether UMG's transactions with Digital Content Providers such as Apple iTunes are licenses;

(c)    Whether UMG breached the covenant of good faith and fair dealing inherent in each of its Recoding Agreements;

(d)    Whether UMG benefited financially from its wrongful acts;

(e)    Whether UMG acted in a manner calculated to conceal the illegality of its actions from recording artists and music producers;

(f)    Whether UMG will continue collecting licensing income from Digital Content Providers and misrepresent the royalties due for such licensing income to their recording

artists and music producers despite knowing that such misrepresentation constitutes a breach of its artists' recording contract;

(g)     Whether UMG, because of the conduct alleged herein, must comply with California Code of Civil Procedure §§ 337 and 337a, and provide a proper accounting of the amounts owed to Plaintiffs and other Class members;

(h)     Whether UMG, by way of the conduct alleged herein, engaged in deceptive or unfair acts or practices in violation of California unfair trade practices laws including, but not limited to, California Business & Professions Code §§ 17200, *et seq.* for which Plaintiffs and the other Class members are entitled to recover;

(i)     Whether UMG, by way of the conduct alleged herein, engaged in deceptive acts or practices in violation of New York's unfair trade practices law including, but not limited to, New York General Business Law § 349, *et seq.*, for which Plaintiffs and the other Class members are entitled to recover;

(j)     Whether, assuming UMG intends to continue breaching its contractual obligations to Plaintiffs and the other Class members, and/or to violate state statutory law, declaratory and injunctive relief is appropriate to curtail its conduct as alleged herein;

(k)     Whether Plaintiffs and the other Class members have been damaged by UMG's actions or conduct; and

(l)     The proper measure of damages.

111.     Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature. Plaintiffs' claims are typical of the claims of the other Class members and Plaintiffs have the same interests as the other Class members. Plaintiffs have no interests that are antagonistic to, or in conflict with, the interests of the other members of the Class. Plaintiffs are adequate representative of the class and will fairly and adequately protect the interests of the Class.

112.     The prosecution of separate actions by individual members of the Class could create a risk of inconsistent or varying adjudications with respect to individual members of the

Class which could establish incompatible standards of conduct for Defendant or adjudications with respect to individual members of the class which would, as a practical matter, be dispositive of the interests of the members of the Class not parties to the adjudications.

113.    Furthermore, as the damages suffered by some of the individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for the individual members of the Class to redress the wrongs done to them individually.

114.    Plaintiffs anticipate no unusual difficulties in the management of this litigation as a class action. Class members may be identified from UMG's records and such Class members may be notified of the pendency of this action by mail or by electronic means (like email), using techniques and a form of notice customarily used in class actions.  Damages can be calculated through a formula, and can be generated by use of UMG's royalty accounting software, with appropriate changes to the inputs.

115.    For the above reasons, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## VI.    CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Breach of Contract)

116.    Plaintiffs repeat and reallege each and every allegation as though fully set forth herein.

117.    Plaintiffs and Class members entered into their agreements with UMG or one of its affiliates and have satisfied all of their obligations under each such agreement.

118.    These recording and producing agreements contain the same or substantially similar terms relating to the treatment of licensing income for royalty payments.  By definition, and pursuant to the Ninth Circuit's ruling in the *F.B.T.* case, such licensing income includes income derived from the licensing of recordings to Digital Content Providers for permanent downloads.

119.     Plaintiffs and Class members have performed their obligations under these contracts by providing recordings to UMG to exploit.

120.     By reason of the foregoing, and through other acts not presently known to Plaintiffs and Class members, UMG has materially breached its contractual obligations under its pertinent recording and producing agreements between itself and Class members (including Plaintiffs) by failing to properly account and provide adequate royalty compensation to Plaintiffs and Class members with regard to licensing of master recordings to Digital Content Providers. Furthermore, UMG has disregarded the rights of Plaintiffs and Class members by breaching its contractual obligations.

121.     Notwithstanding written notice on behalf of Plaintiffs and the Class, UMG has failed and refused to cure these breaches and continues to incorrectly calculate these royalties in violation of Plaintiffs' and Class members' recording and producing agreements.  Further, UMG has continued to disregard the rights of Plaintiffs and Class members.

122.     By reason of the foregoing, Plaintiffs and Class members have been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

123.     Plaintiffs repeat and reallege every allegation as though fully set forth herein.

124.     Plaintiffs have performed their obligations under the respective recording and producing agreements with UMG described above and all conditions required for Defendant's performance under them have occurred.

125.     Under applicable law, where a contract confers on one party a power or discretion affecting the rights of the other, a duty is imposed to exercise such discretion in good faith and in accordance with fair dealing.  By the course of conduct alleged herein, UMG has not acted in good faith or in accordance with fair dealing by, among other things, improperly treating its transactions with Digital Content Providers who provide permanent downloads to consumers as sales rather than licenses and by, among other things, failing to properly account and provide adequate royalty

compensation to Plaintiffs and Class members with regard to licensing of recordings to Digital Content Providers. UMG has therefore unfairly interfered with Plaintiffs' rights to receive benefits under their respective Recording Agreements.

126.     Plaintiff and Class members have been damaged as a result of UMG's breaches of the implied covenant of good faith and fair dealing by failing to properly account and provide adequate royalty compensation to Plaintiffs and Class members with regard to licensing of master recordings to Digital Content Providers.  These underpayments constitute damages to Plaintiffs and Class members that they otherwise would not have incurred, for which Plaintiffs and Class members seek relief as prayed below.

## THIRD CAUSE OF ACTION

### (Declaratory Judgment)

127.     Plaintiffs repeat and reallege each and every allegation as though fully set forth herein.

128.     Pursuant to its Recording Agreements, UMG is obligated to pay and/or credit Plaintiffs and the other Class members a certain percentage of the income UMG derives from its licensing of recordings to Digital Content Providers for permanent downloads, but UMG has failed to provide sufficient payment/credit to Plaintiffs and Class members by unlawfully mischaracterizing these licenses as sale agreements.

129.     By reason of the foregoing, there is a present controversy between Plaintiffs and Class members, on the one hand, and UMG, on the other hand, with respect to which this Court should enter a declaratory judgment determining that the pertinent agreements obligate UMG to pay and/or credit Plaintiffs and Class members the percentage specified for licensing, rather than for sales, when UMG licenses such recordings to Digital Content Providers for permanent downloads.

## FOURTH CAUSE OF ACTION

### (Common Counts - Open Book Account:

### California Code Civ. Proc. § 337a)

130.     Plaintiffs repeat and reallege each and every allegation as though fully set forth herein.

131.     This cause of action applies to recording and producing agreements governed by California law.

132.      Pursuant to UMG's agreements with Plaintiffs and the other Class members, UMG keeps, and at all relevant times has kept, open book accounts reflecting the debits and credits made to each Class member's account with UMG from inception. Plaintiffs are informed and believe that said open book accounts include entries reflecting income UMG has received, and continues to receive, from its license agreements with Digital Content Providers.

133.     These book accounts constitute the principal records of the transactions between UMG and all Class members, including Plaintiffs.

134.     Plaintiffs are informed and believe that said book accounts are, and at all relevant times were, created in the regular course of UMG's business and kept in a reasonably permanent form and manner.

135.     UMG has become indebted to Plaintiffs and the other Class members on said open book accounts in an amount equal to UMG's underpayment on the income UMG has received, and continue to receive, from its licensees for digital downloads.

136.     As such, the outstanding balance actually owed by UMG to Plaintiffs and Class members on said open book includes a calculation of the amount of underpayment with respect to digital downloads, and can be determined by examining all of the debits and credits recorded for each account.

1

**FIFTH CAUSE OF ACTION**

2

**(Violations of California's Unfair Competition Law:**

3

**California Business & Professions Code § 17200, et seq.)**

4

137.    Plaintiffs repeat and reallege each and every allegation as though fully set forth

5

herein.

6

138.    California Business and Professions Code § 17200, et seq. (the "UCL") prohibits

7

any unlawful, unfair or fraudulent business acts or practices.

8

139.    Fair dealings with artists, such as the musicians in the proposed Class here, is a

9

matter of great public concern in California and elsewhere. As a society, we value creative

10

expression, and therefore foster and protect such expression through copyright, trademark and

11

other intellectual property laws.

12

140.    Specifically applicable here is Senate Bill No. 1034, through which the California

13

Legislature determined that "the recording industry is an important industry to the State of

14

California" and that "artist labor is an important resource to the people of California that is vital to

15

maintaining a healthy and vibrant recording industry," and that the public has an interest in

16

preventing "purposeful neglect" of royalty recipients.  Accordingly, the Legislature enacted Civil

17

Code § 2501, allowing an artist to audit the books of a record label "to determine if the royalty

18

recipient earned all of the royalties due" under his or her agreement.  Simply put, the public has an

19

interest in fostering creative music expression and is harmed when the value of that expression is

20

not properly recognized and supported.

21

141.    The fair treatment of artists has been a matter of intense public concern. The

22

California Senate Judiciary Hearing mentioned above reflects this concern.   In fact, both before

23

and after the *F.B. T.* case, there has been extensive news coverage about how artists are

24

shortchanged on digital download royalties by record labels, including UMG.  For example, the

25

*Hollywood Reporter* ran a lengthy piece in its Feb. 22, 2012 issue on how the record labels

26

mistreat artists and engage in all sorts of dubious accounting.  See Gardner, *Leaked Audit In*

27

*Eminem Royalty Suit Highlights Huge Stakes for Record Industry*, located at

28

http://www.hollywoodreporter.com/thr-esq/eminem-royalty-lawsuit-aftermath-records-fbt-productions-293881 (last visited Aug. 30, 2012).  There are segments of the consuming public on iTunes that support artists' rights and feel that artists ought to get full compensation for the download of their works.  See, e.g., iTunes Music Store, Facelift for a Corporate Industry, located at http://www.downhillbattle.org/itunes/ (last visited Aug. 30, 2012).  This lawsuit has generated intense public interest and press coverage.  For example, the Future of Music Coalition, a national nonprofit organization, also has published a lengthy piece on this case and the other class action suits spawned by the *F.B.T.* case.  See Varona, *Just My Label (Running Away with My Royalties)*, located at http://futureofmusic.org/blog/2012/03/20/just-my-label-running-away-my-royalties (last visited Aug. 30, 2012)

142.    As detailed herein, UMG has violated the UCL by engaging in unlawful, fraudulent and unfair business practices, including but not limited to in the following manner:

A.  UMG's conduct was unlawful in that UMG engaged in a broad scheme to cheat artists out of payments otherwise due them through its systematic, across-the-board, and intentional misinterpretation of the nature of its dealings with Digital Content Providers.  UMG either knew or recklessly disregarded that the income it collected from Digital Content Providers for permanent downloads was licensing income, and as such, that the royalties payable to Plaintiffs and the other Class members should have been accounted and paid for on this basis, just as they were for conditional downloads and other licensed uses.

B.  UMG's conduct was fraudulent in that UMG formulated an opaque and artificial method for accounting for and paying artists for income derived from such licenses likely to deceive its royalty participants and the public at large.  It also engaged in a sustained public relations effort designed to convince the public and its royalty participants that it had employed "groundbreaking" and "enlightened" accounting practices that actually benefitted (rather than cheated) artists.  It repeatedly made statements to the public and to its royalty participants characterizing its agreements with Digital Content Providers as resale agreements.  It sought to enlist those providers in an effort to re-characterize its dealings with them to facilitate its conduct

1    toward its artists.  By failing to disclose the true nature of its relationship with Apple and other

2    Digital Content Providers, and by employing such other devices as are alleged above, UMG

3    engaged in conduct that had a tendency to mislead and deceive artists and the public.

4            C. UMG's conduct as alleged herein was unfair in that it is immoral, unethical,

5    oppressive, unscrupulous, unconscionable and/or substantially injurious to Plaintiffs and the Class,

6    and is contrary to and undermines legislatively declared public policy.  The harm to Plaintiffs and

7    Class members resulting from UMG's deceptive and unlawful practices outweighs the utility, if

8    any, of those practices.  There is no possible economic justification for such conduct, and

9    consequently, the gravity of the misconduct outweighs any possible economic justification offered

10   by UMG.

11       143.      UMG's illegal conduct, as described herein, is ongoing, continues to this date, and

12   constitutes unfair and acts and practices within the meaning of Business & Professions Code

13   § 17200, et seq., as interpreted by the California State Courts.

14       144.      Pursuant to California Business & Professions Code § 17203, Plaintiffs and the

15   other Class members are therefore entitled to

16            (a)      An Order requiring UMG to cease the acts of unfair competition alleged

17   herein;

18            (b)       An Order enjoining UMG from continuing to account for royalties payable

19   to Plaintiff and Class member in the manner it does for income derived from such licenses;

20            (c)      Full restitution of all monies paid to and retained by UMG otherwise

21   payable to Plaintiff and Class members, including, but not limited to, disgorgement pursuant to

22   California Code of Civil Procedure § 384;

23            (d)      Interest at the highest rate allowable by law; and

24            (e)      The payment of Plaintiffs' attorneys' fees and costs under, among other

25   provisions of law, Cal. Code Civ. Proc. § 1021.5, or otherwise to the extent permitted by law.

26

27

28

## SIXTH CAUSE OF ACTION

### (Violations of New York's Unfair Competition Law:

### New York General Business Law § 349)

145.     Plaintiffs repeat and reallege each and every allegation as though fully set forth herein. This cause of action applies to contracts governed by New York law.

146.     UMG's acts and practices alleged herein constitute acts, uses, or employment by UMG and its agents of deceptive practices, fraud, false promises, misrepresentations, or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression, or omission, in connection with the sale of merchandise, and with the subsequent performance, in violation of § 349 of New York's General Business Law, making deceptive and unfair acts and practices illegal.

147.     An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful acts or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions." N.Y. Gen. Bus. Law § 349(a).

148.     In breach of its recording contracts, as alleged herein, UMG has failed to properly account to Plaintiff and other Class members the actual amount of royalties due from UMG's licensing contracts with Digital Content Providers. The royalties actually paid to Plaintiffs and others similarly situated are a small fraction of the amounts actually owed by UMG.

149.     Such conduct affected the public interest in New York. Such conduct is not limited to contractual disputes unique to specific counterparties, but involved a company-wide common policy directed to all of UMG's artists whose music is digitally downloaded through Digital Content Providers like iTunes. As noted above, this case presents a dispute that has garnered extensive public attention and support.

150.     The conduct in question also emanated, in part, from UMG in New York and was implemented through written and/or oral communications directed to members of the Class in New York, including some of the Plaintiffs.

151.     UMG's unfair and deceptive trade acts and practices have directly, foreseeably, and proximately caused damages and injury to Plaintiffs and the other Class members and, unless enjoined, will cause further irreparable injury.

152.     As a direct and proximate result of these violations of Section 349 of the General Business Law, Plaintiffs and members of the Class have suffered compensable harm and are entitled to preliminary and permanent injunctive relief, and to recover actual damages, in an amount to be determined at trial, and costs and attorney's fees.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs, on behalf of themselves and the other putative Class members, pray for judgment against UMG as follows:

(a)     An order certifying the proposed Class, designating Plaintiffs as the named representative of the Class, and designating the firms identified in the "Stipulation Among Plaintiffs' Counsel In related Cases Regarding Organization Of Plaintiffs' Counsel In All Cases," approved and entered by the Court on March 7, 2012, as Class Counsel;

(b)     A declaration that UMG is financially responsible for notifying all Class members that the pertinent recording and producing agreements obligate UMG to pay and/or credit Plaintiffs and other Class members the percentage specified in their contracts for licensing, rather than for sales, and that UMG has been improperly accounting for such transactions;

(c)     An order that the unlawful acts alleged in this Consolidated Amended Complaint be adjudged and decreed to be unfair and deceptive business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*.;

(d)      An order that the unlawful acts alleged in this Consolidated Amended Complaint adjudged and decreed to be unfair, unconscionable and/or deceptive trade practices in violation of the New York Deceptive Trade Practices Act, N.Y. Gen. Bus. L. § 349, *et seq*.;

(e)     An order granting preliminary and permanent equitable relief, including an injunction and the imposition of a constructive trust, that would require UMG to abide by the

1  express terms of its recording and producing agreements with regard to licensing of master

2  recordings to Digital Content Providers;

3         (f)    An award to Plaintiffs and the Class of compensatory, exemplary, and/or

4  statutory damages in an amount to be proven at trial;

5         (g)    An order requiring disgorgement and restitution of all revenues, earnings,

6  profits, compensation and benefits received by UMG as a result of its unlawful acts, omissions,

7  and practices;

8         (h)    An award of attorneys' fees and costs, as allowed by law;

9         (i)    An award of pre-judgment and post-judgment interest, as provided by law;

10  and

11         (j)       (h)    Such other or further relief as may be appropriate under the

12  law and the circumstances.

### JURY TRIAL DEMANDED

14      Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs, for themselves and the Class, hereby demand a

15  trial by jury on all matters so triable.

17  Dated:  October 11, 2012

Respectfully Submitted,

/s/ Leonard B. Simon

Leonard B. Simon (State Bar No. 58310)
lens@rgrdlaw.com
LAW OFFICES OF LEONARD B. SIMON
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone:  619-338-4549
Facsimile:  619-231-7423

David M. Given (State Bar No. 142375)
Nicholas A. Carlin (State Bar No. 112532)
Alexander H. Tuzin (State Bar No. 267760)
PHILLIPS, ERLEWINE & GIVEN LLP
50 California Street, 35th Floor
San Francisco, CA   94111
Tel: 415-398-0900
Fax: 415-398-0911
dmg@phillaw.com
nac@phillaw.com
aht@phillaw.com

Kara M. Wolke (State Bar No. 241521)
PHILLIPS, ERLEWINE & GIVEN LLP
1221 Second Street, 3rd Floor
Santa Monica, CA  90401
Telephone:  310-832-0900
Facsimile:   310-514-0911
kmw@phillaw.com

Michael W. Sobol
msobol@lchb.com
Eric B. Fastiff (State Bar No. 182260)
efastiff@lchb.com
Roger N. Heller (State Bar No. 215348)
rheller@lchb.com
Cecelia Han (State Bar No. 235640)
chan@lchb.com
LIEFF CABRASER ET AL.
275 Battery Street, 29th Floor
San Francisco, CA  94111-3336
Telephone:  415-956-1000
Facsimile:   415-956-1008

Michael P. Lehmann (State Bar No. 77152)
Bruce J. Wecker (State Bar No. 78530)
Arthur N. Bailey, Jr. (State Bar No. 248460)
HAUSFELD LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: (415) 633-1908
Facsimile: (415) 358-4980
mlehmann@hausfeldllp.com
bwecker@hausfeldllp.com
abailey@hausfeldllp.com

Bruce L. Simon (State Bar No. 96241)
Aaron M. Sheanin (State Bar No. 214472)
William J. Newsom (State Bar No. 267643)
PEARSON, SIMON, WARSHAW &
PENNY, LLP
44 Montgomery Street, Suite 2450
San Francisco, California 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
bsimon@pswplaw.com
asheanin@pswplaw.com
wnewsom@pswplaw.com

Clifford H. Pearson (Cal. Bar No. 108523)
Daniel L. Warshaw (Cal. Bar No. 185365)
PEARSON, SIMON, WARSHAW &
PENNY, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
dwarshaw@pswplaw.com
cpearson@pswplaw.com

Michael D. Hausfeld
James J. Pizzirusso
HAUSFELD LLP
1700 K Street, NW
Suite 650
Washington, D.C. 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
mhausfeld@hausfledllp.com
jpizzirusso@hausfledllp.com

R. Alexander Saveri
Cadio Zirpoli
Melissa Shapiro
SAVERI & SAVERI, INC.
706 Sansome St.
San Francisco, California  94111-1730
Telephone: 415-217-6810

Raymond P. Boucher (Bar No. 115364)
Jeffrey A. Koncius (Bar No. 189803)
KIESEL BOUCHER LARSON LLP
8648 Wilshire Boulevard
Beverly Hills, California 90211
Telephone: (310) 854-4444
Facsimile:  (310) 854-0812
Email: boucher@kbla.com
Email: koncius@kbla.com

Edgar D. Gankendorff
Christophe Bela Szapary
PROVOSTY & GANKENDORF, L.L.C.
650 Poydras Street, Suite 2700
New Orleans, LA  70130
Telephone: (504) 410-2795
Facsimile: (504) 410-2796
egankendorff@provostylaw.com
cszapary@provostylaw.com

Neville L. Johnson (Bar No. 66329)
JOHNSON & JOHNSON LLP
439 N. Canon Drive, Suite 200
Beverly Hills, California 90210
Telephone: (310) 975-1080
Facsimile:  (310) 975-1095
Email: njohnson@jjllplaw.com

Bryan L. Clobes
CAFFERTY FAUCHER LLP
1717 Arch St., Ste. 3610
Philadelphia, PA 19103
Telephone: 215/864-2800
Facsimile: 215/864-2810

1

**FILER'S ATTESTATION**

2    Pursuant to General Order No. 45, Section X (B) regarding signatures, I, David M. Given, attest

3    that concurrence in the filing of this document has been obtained.

4    Dated:  October 11, 2012                    By /s/ David M. Given

5                                                        David M. Given

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28