1    LEONARD B. SIMON (State Bar No. 58310)
     THE LAW OFFICES OF LEONARD B. SIMON P.C.
2    655 West Broadway, Suite 1900
     San Diego, CA  92101
3    Telephone:  619/338-4549
     Facsimile:  619/231-7423
4    Email:  lsimon@rgrdlaw.com

5    JEFFREY D. GOLDMAN
     JEFFER MANGELS BUTLER & MITCHELL LLP
6    1900 Avenue of the Stars
     Los Angeles, CA  90067-4308
7    Telephone:  310/203-8080
     Facsimile:  310/203-0567
8    Email:  jdg@jmbm.com

9    *Attorneys for Plaintiff and the Putative Class*

10

11                    UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13                   SAN FRANCISCO COURTHOUSE

14

15   RICK JAMES, by and through THE JAMES      )   Case No. CV-11-1613 (SI)
     AMBROSE JOHNSON, JR., 1999 TRUST,         )
16   his successor in interest, individually and on   )   JOINT CASE MANAGEMENT STATEMENT
     behalf of all others similarly situated, *et al.*,   )
17                                             )   DATE:      February 28, 2014
                              Plaintiffs,      )   TIME:      3:00 p.m.
18                                             )   CTRM:      10 (19th Floor)
     vs.                                       )            The Honorable Susan Illston
19                                             )
     UMG RECORDINGS, INC., a Delaware          )
20   corporation,                              )
                                               )
21                            Defendants.      )
     _____     )
22                                             )
     AND RELATED ACTIONS                       )
23                                             )
     _____     )

24

25

26

27

28

**TABLE OF CONTENTS**

**Page**

I. MOTIONS ........................................................................................................1

    A. Plaintiffs' Statement...............................................................................1

    B. UMGR's Statement ...............................................................................1

II. DISCOVERY ...................................................................................................3

    A. Plaintiffs' Statement...............................................................................3

    B. UMGR's Statement ...............................................................................6

III. PRINCIPAL LEGAL AND FACTUAL ISSUES IN DISPUTE....................12

    A. Plaintiffs' Statement.............................................................................12

    B. UMGR's Statement .............................................................................12

IV. SCHEDULING OF CLASS CERTIFICATION MOTION AND OTHER
FURTHER PROCEEDINGS IN THE CASE ................................................21

    A. Plaintiffs' Position ...............................................................................21

    B. UMGR's Position.................................................................................22

V. PARALLEL CASES AGAINST OTHER INDUSTRY MEMBERS .............25

    A. Plaintiffs' Position ...............................................................................25

    B. UMGR's Position.................................................................................25

VI. SETTLEMENT AND ADR............................................................................26

GENERAL ORDER 45 CERTIFICATION .............................................................27

CERTIFICATE OF SERVICE .................................................................................28

Pursuant to Civil Local Rule 16-10(d), the parties in the above-captioned actions respectfully submit the following joint case management statement for the case management conference scheduled for February 28, 2014.

## I. MOTIONS

### A. Plaintiffs' Statement

During June and July 2011, defendant UMG Recordings, Inc. ("UMGR") filed: (a) a motion to dismiss the action for improper venue, or to transfer the action to Central District of California; and (b) a motion to dismiss the fourth cause of action for violation of California Business and Professions Code § 17200. On November 1, 2011, the Court issued an order denying both motions. *James* Dkt. 49.

On March 2, 2012, defendant UMGR filed a motion for partial summary judgment, which was denied without prejudice. *James* Dkt. 66. The Court also denied UMGR's motion based on the UCL statute of limitations, pending the decision of the California Supreme Court in *Aryeh v. Canon Business Solutions, Inc*. Dkt. 87, at 4. *Aryeh* was decided on January 24, 2013. 55 Cal. 4th 2013.

On September 7, 2012, Plaintiffs moved to file a consolidated amended complaint ("CAC"), which motion was granted. *James* Dkt. 111.

Discovery motions are discussed below in Section II.

### B. UMGR's Statement

#### 1. Motion to Dismiss Ridenhour's Open Book Account Claim

On January 10, 2012, defendant UMGR filed a motion to dismiss the open book account claim of Plaintiff Carlton Ridenhour, on the ground that Ridenhour's claims are governed by New York law, which does not recognize open book account claims. On February 13, 2012, the Court issued an order granting UMGR's motion. *Ridenhour* Dkt. 24.

#### 2. Motion for Summary Judgment on UCL and Open Book Account Claims

On April 19, 2012, just after the filing of the last CMC statement, this Court denied, without prejudice, UMGR's motion for summary judgment on five Plaintiffs' claims for violations of California Business and Professions Code section 17200 ("UCL") and for open book account. On

1    the UCL claim, the Court concluded that the motion was premature because "Plaintiffs have not yet

2    deposed any [UMGR] representatives and only recently received initial document productions from

3    [UMGR]" and "[t]he Court cannot fully assess the impact of defendant's conduct on the Plaintiffs as

4    well as the public interest based on the current record[.]"  Dkt. 87, at 4.

5         The Court also denied UMGR's motion based on the UCL statute of limitations, pending the

6    decision of the California Supreme Court in *Aryeh v. Canon Business Solutions, Inc.*  Dkt. 87, at 4.

7    *Aryeh* was decided on January 24, 2013.  55 Cal. 4th 2013.  The *Aryeh* court concluded that the

8    discovery rule could operate to toll the UCL statute of limitations, but that tolling was not supported

9    based on the facts of the case.  More relevant to this case, the *Aryeh* court ruled that "the UCL is

10   governed by common law accrual rules to the same extent as any other statute.  That a cause of

11   action is labeled a UCL claim is not dispositive; instead, 'the nature of the right sued upon' . . . and

12   the circumstances attending its invocation control the point of accrual.  The common law last

13   element accrual rule is the default . . . while exceptions to that rule apply precisely to the extent the

14   preconditions for their application are met, as would be true under any other statute."  55 Cal. 4th at

15   1196-97.  Accordingly, as Plaintiffs' UCL claims are based upon underlying breaches of contract,

16   the common law accrual rules applicable to contract claims under California law should apply.

17        Finally, this Court denied UMGR's motion on certain[1] Plaintiffs' open book account claims,

18   finding that defendant's argument that "Plaintiffs have failed to meet their burden on summary

19   judgment to 'prove the parties specifically agreed to treat their contractual relationship as an open

20   book account' . . . [g]iven the state of discovery . . . is premature.  Plaintiffs should be given the

21   opportunity to uncover and review evidence regarding defendants' contracts with the proposed class,

22   as well as how those contracts were interpreted and applied, to support their argument. . . . .  After

23   adequate discovery, defendant may renew its motion regarding the mutual understanding of the

24   parties with respect to creating open book accounts."  Dkt. 87, at 5-6.

25

26   _____

27   [1]    Plaintiffs Ridenhour, McLean and Titus, whose contracts are governed by New York law, do not
     have open book account claims.  *See Ridenhour* Dkt. 24 (granting UMGR's motion to dismiss
28   Ridenhour's open book account claim).

JOINT CASE MANAGEMENT STATEMENT - CV-11-1613 (SI)          - 2 -

### 3.      Motion for Leave to File Consolidated Amended Complaint

In their statement preceding the last CMC on April 20, 2012, Plaintiffs asserted that they "would like to move forward on class certification as soon as possible.  Plaintiffs are reviewing the artists' contracts, which will be central to this effort, but will also want to see the F.B.T. documents and some additional discovery before they move for certification."  Dkt. 83, at 11.  At Plaintiffs' request, this Court set class certification briefing to commence on October 12, 2012.

UMGR produced the *F.B.T.* documents by July 2012, and effectively all (about 25,000) of the requested artist and producer contracts by August 2012.  Dkt. 129, at 2.  On September 7, 2012, Plaintiffs sought leave to file a Consolidated Amended Complaint ("CAC") Dkt. 111, having (in Magistrate Judge James' words) "reviewed the contracts sufficiently to ascertain that they contain enough differences to merit amending the complaint."  Dkt. 170, at 3-4 (discovery order).  Plaintiffs also sought to vacate the class certification briefing schedule.  Dkt. 125, at 2.  The Court granted Plaintiffs' motion to file the CAC, Dkt. 129, and vacated the briefing schedule.  Dkt. 125, at 2.

In the CAC, Plaintiffs allege that the putative "class" artist contracts are sometimes "not clear or even contradictory on the subject" of digital download royalties, CAC ¶ 16, and add claims for breach of the implied covenant of good faith and fair dealing and for unfair competition under New York law.  *Id*. ¶¶ 123-126, 145-152.  Three Plaintiffs – Rob Zombie, White Zombie, and Damon "Otis" Harris – withdrew from the case and dismissed their claims, and are not part of the CAC.  Dkt. 129, at 2.  Another Plaintiff, Otis Williams, withdrew from the case and dismissed his claims in July 2013.  Dkt. 163.  Eight Plaintiffs remain – Rick James (by way of a trust), Dave Mason, Whitesnake (Overseas) Ltd., Carlton Ridenhour, Ron Tyson, Bo Donaldson, William McLean, and Andres Titus.

## II.   DISCOVERY

### A.    Plaintiffs' Statement

Discovery has been difficult and time-consuming.  UMGR has:

1.      produced its recording contracts with a large number of artists;

2.      produced a small number of hard-copy documents such as memo and letters in response to Plaintiffs' requests for production; and

3.      produced a miniscule number of emails in response to those same requests for production, but apparently has done no comprehensive search of its ESI for responsive material.

Although UMGR asserts below that it has produced nearly 700,000 pages of documents, it also acknowledges that the bulk of those documents are artist and producer contracts, not internal UMGR materials.

Plaintiffs have taken depositions of eight UMGR personnel, and have two depositions they wish to take in April.  Plaintiffs believe that no other depositions are needed for class certification purposes, although the results of the ESI and privilege disputes (described below) may conceivably reveal one or two additional deponents.

UMGR has deposed all the Plaintiffs, some for a second time after the filing of the CAC. UMGR has also submitted voluminous written discovery to each named Plaintiff: over 44 interrogatories to each of 8 Plaintiffs, most of which needed to be answered separately for each Plaintiff with reference to its contract; and a total of 826 requests for admissions.  The effort required to respond has been enormous.

Both parties have expressed dissatisfaction with some of their adversaries' discovery responses, and each side has filed several motions seeking further discovery responses before Magistrate Judge James.  All such motions have been resolved except as noted below.

The two discovery issues Plaintiffs contend require further consideration are (1) production of ESI, and (2) documents withheld as privileged:

### 1.      ESI

This issue first arose when Plaintiffs requested, *inter* alia, documents relating to UMGR's major policy decision in 2002 as to how it would pay recording artists for digital downloads, reflected in a document referred to as the "Ostroff Memo."  UMGR produced very little in response. In the ensuing motion to compel, Plaintiffs sought, *inter alia*, an order requiring UMGR to perform a more thorough search of its documents (including ESI) for responsive material, which request was denied by Magistrate Judge James, subject to renewal later upon a proper showing.  Plaintiffs disagree with UMGR's assertion below that deposition testimony of its records custodian "confirmed the representations UMGR had made in the discovery letter [Dkt. No. 131] to Magistrate

1   Judge James." Rather, the testimony established that UMGR misrepresented the burden of searching

2   and collecting ESI. *See* Dkt. 131 fn.7. Mr. Lancaster testified that the process for locating server

3   backup tapes for custodians was not a tape-by-tape review. Instead, he said that all that was required

4   was identifying which server stored emails for a given custodian from an existing list. Lancaster

5   Dep. 198:15-204:4. Further, Lancaster contradicted counsel's representation that, to collect a

6   custodian's ESI, one must travel to his location; rather, it could all be done remotely at UMGR. *Id.*

7   at 198:15-200:6.

8       After Judge James' ruling, UMGR continued to expand its privilege log, but not its

9   production. The log now numbers over 350 documents, much of it ESI. It appeared that when

10  UMGR looked for additional documents, including ESI, often seemingly in preparation for

11  defending depositions rather than to respond to Plaintiffs' requests, it always found additional

12  privileged documents, but they were somehow accompanied by no non-privileged documents that

13  could be produced to Plaintiffs.

14      Plaintiffs again asked UMGR to undertake a proper search for responsive ESI, since it

15  appeared that the ESI sources for these privileged documents had not previously been searched.

16  Those negotiations have been long and unsuccessful. UMGR's resistance to reasonable terms for an

17  ESI protocol is beyond that experienced by Plaintiffs' counsel in a wealth of other cases.

18      When impasse was reached earlier this month, Plaintiffs provided UMGR with their portion

19  of a letter-brief on this subject, and UMGR has recently provided its portion. Plaintiffs are finalizing

20  their portion of the letter, and the matter will then reside with the Magistrate Judge, unless this Court

21  wishes to resolve it in the first instance or provide some guidance to expedite the matter. The non-

22  final letter-brief is attached as Exhibit A for the informal information of the Court, and will be

23  finalized by Plaintiffs in the next few business days.

24                  **2.      Privilege**

25      As noted above, UMGR has withheld over 350 documents on the basis of privilege, and

26  Plaintiffs have challenged over 200 of those withholdings thus far. Most of the withheld documents

27  relate to the events of 2002 and the Ostroff Memo, in which UMGR announced an across-the-board

28  policy on artist royalties for digital downloads.

1   The privilege issue is before this Court.  Magistrate Judge James issued an order on

2   February 10 denying in full Plaintiffs' motion to compel the production of over 200 documents

3   withheld as privileged.  Plaintiffs believe that the ruling is erroneous and are today filing a Motion

4   for Relief from Non-Dispositive Ruling by Magistrate Judge.[2]

5   The startling result of UMGR's intransigence on searching and producing ESI, combined

6   with its withholding of hundreds of purportedly privileged documents, is that **UMGR is withholding**

7   **far more material relating to the crucial decision reflected in the Ostroff Memo than it has**

8   **produced**.  This situation must be remedied before class certification is decided.

9   **B.    UMGR's Statement**

10   Plaintiffs' statement regarding discovery is a piece of advocacy, not a helpful and neutral

11   summary of what has transpired.  Plaintiffs' claim that discovery has been "difficult" really means

12   that Plaintiffs are disappointed that Magistrate Judge James has largely ruled against them on the

13   discovery motions that have been filed by both sides, including on the very issues about which

14   Plaintiffs complain in their statement.  Their statement that UMGR "apparently has done no

15   comprehensive search of its ESI for responsive material" and complaints about UMGR's assertion of

16   attorney-client privilege are highly misleading, as they ignore that the scope of UMGR's search for

17   documents (including ESI) and the propriety of its privilege log have been addressed, and resolved

18   in UMGR's favor, by Magistrate Judge James.  Plaintiffs then delayed **for 16 months** before seeking

19   further relief,[3] in a joint letter that UMGR returned to them last Thursday.  *See* Exhibit A.  Even this

20   soon-to-be-pending motion does not seek any specific relief other than requesting that UMGR

21   provide additional information to Plaintiffs and that the parties continue to meet and confer.

22   Nevertheless, because Plaintiffs have suggested this Court preempt Magistrate Judge James' ruling

23

24   [2]    Plaintiffs had advised UMGR and Judge James that they intended to file two separate motions
    challenging the privilege claims (the second addressing a narrower set of issues), and Plaintiffs'
25   portion of the second letter was in the hands of UMGR when the Magistrate Judge issued her
    February 10 ruling on the first privilege dispute.  Given that ruling, Plaintiffs are contemplating
26   when and how to place that second dispute before Magistrate Judge James or this Court, but
    guidance from this Court on the first privilege dispute may help resolve the second.

27   [3]    Plaintiffs claim that discovery has been "time-consuming" is largely a reflection of their own
    unexplained (perhaps tactical) sluggishness in actively pursuing the production of additional ESI, as
28   discussed in more detail herein and in Exhibit A.

1    on that fully-briefed issue, UMGR incorporates Exhibit A (which briefs the issues in dispute) by this

2    reference.

3           The following discovery has been taken:

4                  **1.      Documents**

5           UMGR has propounded between 36 and 41 document requests on each Plaintiff.  Plaintiffs

6    have produced relatively few documents.

7           Plaintiffs have propounded 11 sets of document requests on UMGR, consisting of 76

8    separate individual requests.  UMGR has produced nearly 700,000 pages of documents.  Plaintiffs'

9    claim that virtually the entirely of this production consists of artist and producer contracts is false.

10   UMGR has produced approximately 275,000 pages of documents that are not artist or producer

11   contracts.   However, this is largely beside the point, as the artist and producer contracts are

12   obviously the most important documents in a case concerning the terms and alleged breach of those

13   contracts.  Plaintiffs' claim that UMGR has not produced a large number of emails concerning the

14   so-called "Ostroff Memo" which they assert provided for an "across-the-board policy on artist

15   royalties" ignores that (a) that memo is hardly an actionable or significant event – indeed, as

16   Magistrate Judge James noted, that supposed "policy" merely provided for UMGR "to pay artists

17   higher royalties than they deserved" (Dkt. 181, at 3), *i.e.*, it provided that UMGR would ***refrain*** from

18   taking certain ***deductions*** from an artist's royalties even if that artist's particular contract permitted

19   UMGR to take such deductions; (b) if there are any documents regarding the "Ostroff Memo" other

20   than those already produced or logged, they are likely to be very few in number and most likely

21   privileged; (c) it is hardly surprising that that most of the emails concerning a decision made by

22   consulting lawyers and based on their legal advice, would be privileged; (d) Magistrate Judge James

23   has fully and properly rejected Plaintiffs' tactic of demanding that UMGR produce "more"

24   nonexistent documents, or waive its attorney-client privilege, merely because Plaintiffs speculate

25   there "must" be more nonprivileged documents on this or any other subject; and (e) now that

26   Plaintiffs have finally provided UMGR with proposed search terms, the identities of selected

27   custodians, and a proposed time period, the issue of UMGR's search for additional emails regarding

28

1    the "Ostroff Memo" and related topics is close to a resolution, with the unresolved aspects of the

2    issue soon to be before Magistrate Judge James.  *See* Exhibit A.

3           To the extent Plaintiffs imply that UMGR has failed to produce what it agreed to produce or

4    was ordered to produce, such claims are false.  UMGR has been open and transparent in regard to

5    the documents it possesses and whether and to what extent it contends such documents can

6    reasonably be searched for *responsive* material.  Thus far, Magistrate Judge James has found

7    UMGR's position reasonable and appropriate, and Plaintiffs' accusations unsupported and

8    unpersuasive.  In October 2012, Plaintiffs filed a discovery motion asserting that UMGR had failed

9    to perform a reasonably diligent search for documents from the 2000-04 time period.  In its portion

10   of that discovery letter, UMGR specifically noted the difficulty of retrieving emails from the 2000-

11   04 time period, even for current employees (to the extent such emails even exist), let alone finding

12   responsive emails, and argued that it was not required to do so as part of any reasonably diligent

13   search for responsive documents.  Dkt. 131, at 4 & n.7.  On November 6, 2012, Magistrate Judge

14   James denied Plaintiffs' motion without prejudice.  Dkt. 133.

15          Plaintiffs then took a Rule 30(b)(6) deposition of UMGR's custodian of electronic records in

16   March 2013, which confirmed the representations UMGR had made in the discovery letter to the

17   Court.  Plaintiffs' claims to the contrary, citing to the deposition of this custodian, Mr. Lancaster, are

18   both inaccurate and irrelevant.[4]  After that Rule 30(b)(6) deposition, Plaintiffs ostensibly sought to

19

---

20   [4]   UMGR never asserted that locating emails from backup tapes for a particular custodian required
     a "tape-by-tape review" of all of UMGR's backup tapes; rather, what Mr. Lancaster confirmed was
21   that locating emails from backup tapes for even a single particular custodian would likely require
     restoring and reviewing multiple tapes.  Lancaster Dep. 198:20-201:20.  In any event, locating the
22   correct backup tapes is not the issue –it is the tremendous expense of restoring a large number of
     backup tapes and of searching through the massive amounts of data they contain for potentially
23   responsive documents that would be unduly costly and burdensome.  Regardless, the issue of backup
     tapes is irrelevant, as Plaintiffs have never even requested that UMGR search its backup tapes (let
24   alone offer to pay the costs of such a project).  Likewise, Lancaster did reconfirm, and did not
     remotely contradict, UMGR's representation that personally visiting a custodian's office would be
25   necessary to collect pre-December 2007 ESI.  Lancaster Dep. 204:10-210:10.  Further, that issue is
     also irrelevant, as since Lancaster's deposition, the parties have reached agreement on the identities
26   of 15 specific custodians on whose emails from a specific period of time (if any exist) Plaintiffs wish
     to perform keyword searches.  Thus, whether it would be unduly burdensome for UMGR to locate
27   and review the emails of hundreds or even thousands of employees located in various offices
     throughout the U.S. (as Plaintiffs originally demanded) is no longer an issue.
28

---

1   meet and confer with UMGR about reasonable methods, if any exist, for UMGR to attempt to locate

2   potentially responsive emails or other documents from the 2000-04 time period.  But Plaintiffs have

3   done so in a remarkably slothful manner.  The process has taken 16 months only because, after

4   UMGR proposed a resolution, long periods of time, sometimes months, went by with nothing but

5   silence and inaction from Plaintiffs before they finally responded – and that response usually took

6   the form of just more questions, never a specific, concrete proposal to resolve the issue.  Even when

7   UMGR agreed to use **every one** of Plaintiffs' proposed search terms, and to search available emails

8   (other than those that may be on backup tape) for **every one** of the 15 custodians requested by

9   Plaintiffs, for the **entire time period** desired by Plaintiffs (1999-2004), and even offered an

10  objectively measurable mechanism for Plaintiffs to request additional searches depending on the

11  results of those initial searches, Plaintiffs continued to delay and equivocate.  Quite literally,

12  Plaintiffs will not take "yes" for an answer.

13          At several points during this process, in the absence of any guidance from Magistrate Judge

14  James due to Plaintiffs' refusal to seek any relief, UMGR voluntarily undertook to review certain

15  subgroups of documents from the 2000-04 era.  The result was that a few hundred responsive

16  documents were located, virtually all of them privileged.  Plaintiffs' baseless accusation that UMGR

17  has searched for privileged documents but not for unprivileged ones makes no sense – it is not

18  possible to search emails in that manner, and Magistrate Judge James specifically found that UMGR

19  has **not** asserted a "blanket privilege over its communications" but has evaluated each document on a

20  case-by-case basis.  Dkt. 181, at 5.  UMGR prepared a detailed privilege log, which it voluntarily

21  amended to provide even more detail when Plaintiffs demanded it.  Plaintiffs then filed a discovery

22  motion, claiming that many of the logged documents were not in fact privileged.  On February 10,

23  2014, in a detailed Order based upon her comprehensive review of UMGR's 60-page privilege log,

24  Magistrate Judge James rejected Plaintiffs' contentions in their entirety.  Dkt. 181, at 5 ("the Court

25  finds that UMGR . . . invoked attorney-client privilege only for those documents involving legal

26  advice.").  Plaintiffs' arguments that even though there is no evidence that any additional

27  nonprivileged documents exist, there "must" be more, have properly been rejected by Magistrate

28  Judge James.  *See* Dkt. 133, at 3 ("The Court cannot compel the production of documents based

JOINT CASE MANAGEMENT STATEMENT - CV-11-1613 (SI)                          - 9 -

1   solely on the opposing party's speculation and belief that responsive documents exist and that the

2   producing party is withholding them.") (citation omitted).

3              **2.      Depositions**

4          In 2012, UMGR took depositions of each of the named Plaintiffs (including those that later

5   withdrew from the case and dismissed their claims).  After the CAC was filed, UMGR sought and

6   obtained an Order to resume the deposition of the Plaintiffs who remained, over Plaintiffs' objection.

7   Dkt. 144.  The resumed depositions took place between March and April, 2013.  UMGR also took

8   the depositions of the three new Plaintiffs.

9          Between January and May, 2013, Plaintiffs took eight depositions of past or present UMGR

10  employees: Charles Ciongoli, Marjorie Fieldman, James Harrington, Rand Hoffman, Ping Hu,

11  Lawrence Kenswil, Clifton Lancaster and Scott Ravine.  Plaintiffs also requested depositions of

12  former UMGR employees Zach Horowitz and Michael Ostroff, among others, but deferred these

13  depositions pending resolution of the parties' discussions about possible additional searches by

14  UMGR of certain archived emails from the 1999-2004 time period, discussed above.

15             **3.      Written Discovery**

16         UMGR has propounded between 36 and 80 requests for admission on each Plaintiff.

17  Plaintiffs initially objected or responded evasively or incompletely to most of these RFAs, but on

18  September 26, 2013, Magistrate Judge James granted in part and denied in part UMGR's discovery

19  motion regarding certain of UMGR's RFAs to Plaintiff Whitesnake.  Dkt. 171.  Between

20  November 18 and 22, 2013, all Plaintiffs served their most recent amended and/or supplemental

21  responses to UMGR's RFAs, based on the guidance provided by the Order regarding the Whitesnake

22  RFAs.    These responses narrowed and illuminated certain issues, such as fundamental

23  inconsistencies and contradictions between different Plaintiffs' (and therefore putative class

24  members') claims.  However, some of Plaintiffs' responses remain incomplete, evasive or

25  noncompliant with the Order, and UMGR has commenced a meet and confer regarding these issues,

26  and expects to bring a discovery motion on them in the next few weeks if the parties cannot resolve

27  the issues by agreement.

28

1  Plaintiffs have propounded 18 interrogatories on UMGR. UMGR has propounded 44

2  interrogatories on Plaintiffs. *See* Dkt. 155 (granting and denying in part UMGR's request for leave

3  to serve additional interrogatories). Over the course of 2013, Magistrate Judge James granted

4  UMGR's motions to compel responses or further responses (at least in part) to at least 22 separate

5  interrogatories. *See* Dkt. 138 (Nos. 9-12); 170 (Nos. 14-22); 169 (Nos. 24-25); and 168 (Nos. 29-

6  35). These interrogatories concern issues highly relevant to class certification, such as:

7  •  Whether UMGR's agreements with download retailers require the retailers to

8  compensate them for download sales on a (a) flat rate or flat fee basis, (b) cent rate basis, (c) royalty

9  rate basis, or (d) some other basis, as even if one assumed arguendo the correctness of Plaintiffs'

10  contention that these agreements are "licenses," the putative class agreements differ in the way

11  different artists are to be compensated for these various types of alleged "licenses."

12  •  The meaning of various material terms (such as "record," "licensee," and

13  "distribution") in the putative "class" agreements (and whether those meanings differ from Plaintiff

14  to Plaintiff and among putative class members).

15  •  Whether the putative "class" agreements are or are not ambiguous, such that

16  particular parol evidence may or may not be admissible to interpret them (depending on the

17  applicable state law to be applied). (Plaintiffs responded that some are ambiguous and some are

18  not.)

19  •  Whether Plaintiffs' proposed formula(e) for calculating damages on a class-wide

20  basis (for artists, and separately for producers) would, if Plaintiffs were to prevail on their claims,

21  upon rigorous analysis, allow damages to be calculated on a class-wide basis which is just and

22  reasonable, and not arbitrary or speculative. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013).

23  •  Whether the conditions precedent to recovery in each Plaintiff's agreements (such as

24  requirements for specific written objections and other contractual limitations periods) differ from

25  Plaintiff to Plaintiff and (presumably) among putative class members.

26  •  Whether Plaintiffs' claims that the statutory and contractual limitations periods in

27  their and the putative "class" contracts are tolled based on "fraudulent concealment" can be

28

1  adjudicated on a class-wide basis, or is based on individualized issues of knowledge not susceptible
2  to class-wide resolution.

3  •  Whether Plaintiffs' implied covenant and unfair competition claims have any factual
4  basis, or seek any damages, different from the alleged facts and damages underlying Plaintiffs'
5  breach of express contract claims.

6  •  Whether Plaintiffs possess any evidentiary support for their contention that their
7  claims in this case affect consumers.

8  As with the RFAs, some of Plaintiffs' responses are useful to the resolution of class
9  certification issues, and others remain deficient and noncompliant with Magistrate Judge James'
10  Orders.  UMGR has commenced a meet and confer on these remaining issues and expects to bring a
11  discovery motion within the next few weeks unless the parties can resolve the issues by agreement.

12  **III.  PRINCIPAL LEGAL AND FACTUAL ISSUES IN DISPUTE**

13  **A.  Plaintiffs' Statement**

14  1.  Whether the case should be certified as a class action pursuant to Rule 23, Fed. R.
15  Civ. P.

16  2.  Whether defendant breached its contract with Plaintiffs.

17  3.  Whether defendant breached the covenant of good faith and fair dealing as to
18  Plaintiffs.

19  4.  Whether defendant violated California's Unfair Competition Law.

20  5.  What damages were suffered by Plaintiffs.

21  Plaintiffs have provided above the "principal" issues in the case, as appropriate for a CMC
22  Report, and do not believe that the narrow issues listed below by UMGR come close to meeting the
23  definition of "principal."

24  **B.  UMGR's Statement**

25  As the case has developed, the disputed principal legal and factual issues have changed.  In
26  addition to or in place of those issues listed in the last CMC statement, UMGR identifies the
27  following nonexhaustive principal legal and factual issues for each Plaintiff.  (To avoid needless

28

debate as to whether any particular issue is "legal" or "factual," UMGR refrains from characterizing any particular issue as "legal" or "factual" in this document.)

### 1. James Trust

(a)     Whether digital permanent downloads and mastertones (hereinafter collectively "downloads" for ease of reference only) are "records" within the meaning of the agreements on which the James Trust is suing.

(b)     Whether downloads are sold **by** UMGR, sold by UMGR **through** download retailers such as iTunes and Amazon (hereinafter "download retailers"), or sold **by** download retailers.

(c)     Whether the parties intended to treat the three agreements on which the James Trust is suing as a single agreement or as multiple, separate agreements.

(d)     Whether downloads are "audio devices, whether now known or hereafter devised, which are not specifically provided for herein" within the meaning of the 1977 artist agreement on which the James Trust is suing.

(e)     Whether downloads are "audio devices now known or hereafter discovered, and not otherwise covered herein" within the meaning of the 1977 producer agreement on which the James Trust is suing.

(f)     Whether the "basis on which the money received by" UMGR from any download retailer "is not dependent upon the number of records sold" within the meaning of the 1977 producer agreement on which the James Trust is suing.

(g)     Whether downloads are sold "in normal channels of distribution" within the 1979 agreement on which the James Trust is suing.

(h)     Whether the James Trust can meet its burden under the best evidence rule, Fed. R. Evid. 1008, to prove that the stock certificate proving its ownership of the agreements on which it is suing was lost or destroyed other than in bad faith.

(i)     Whether, if Plaintiff Whitesnake prevails on its contention that downloads are "licensed," not "sold," to consumers, the James Trust cannot prevail on its claims.

1    (j)    Whether, if Plaintiff Bo Donaldson prevails on his contention that

2    downloads are not "records," the James Trust cannot prevail on its claims.

3    (k)    Whether the agreements on which the James Trust is suing are

4    ambiguous, thereby potentially permitting admission of particular parol evidence to interpret them

5    under California law.

6    (l)    The existence and applicability of contractual limitations provisions

7    and conditions precedent in the agreements on which the James Trust is suing.

8    (m)    The manner in which "net receipts" are defined and are to be

9    calculated under the agreements on which the James Trust is suing.

10    (n)    Whether, as a non-New York resident, the James Trust possesses a

11    claim under New York General Business Law section 349.

12    **2.    Dave Mason**

13    (a)    Whether downloads are "records" within the meaning of Mason's

14    1969 agreement.

15    (b)    Whether downloads are sold "through any record club or other direct

16    sales to consumer operation" within the meaning of Mason's 1969 agreement.

17    (c)    Whether, if Mason succeeds on his contention (b) above, UMGR is

18    entitled to a setoff for overpaying royalties to Mason based upon the provisions of his 1971

19    agreement (on which he is not suing), which provides for a substantially reduced (one-half) royalty

20    rate for records sold "by direct mail and/or record club distribution. . . ."

21    (d)    Whether Mason can meet his burden to prove that he recovered

22    ownership of his 1969 agreement from the bankruptcy court after declaring bankruptcy in the 1970s

23    to "free" himself of his 1969 agreement.

24    (e)    Whether, if Plaintiff Whitesnake prevails on its contention that

25    downloads are "licensed," not "sold," to consumers, Mason cannot prevail on his claims.

26    (f)    Whether, if Plaintiff Bo Donaldson prevails on his contention that

27    downloads are not "records," Mason cannot prevail on his claims.

28

JOINT CASE MANAGEMENT STATEMENT - CV-11-1613 (SI)                      - 14 -

1          (g)     Whether the 1969 or 1971 agreements are ambiguous, thereby

2  potentially permitting admission of particular parol evidence to interpret them under California law.

3          (h)     The existence and applicability of contractual limitations provisions

4  and conditions precedent in Mason's 1969 agreement.

5          (i)     The manner in which "net receipts" are defined and are to be

6  calculated under Mason's 1969 agreement.

7          (j)     Whether, as a non-New York resident, Mason possesses a claim under

8  New York General Business Law section 349.

9          **3.**     **Whitesnake (Overseas) Ltd.**

10         (a)     Whether downloads are "records" within the meaning of Whitesnake's

11 1982 agreement.

12         (b)     Whether downloads are sold through "normal retail channels" within

13 the meaning of Whitesnake's 1982 agreement.

14         (c)     Whether downloads are "net sales" within the meaning of

15 Whitesnake's 1982 agreement.

16         (d)     Whether downloads are sold "via telephone, satellite, cable or other

17 direct transmission to the consumer over wire or through the air," thereby deeming them sales

18 "through normal retail channels for all purposes," including when sold by licensed third parties,

19 within the meaning of Whitesnake's 1982 agreement.

20         (e)     Whether downloads are "sold" or "licensed" to consumers.

21         (f)     Whether downloads are "Masters" within the meaning of

22 Whitesnake's 1982 agreement.

23         (g)     Whether each download retailer compensates UMGR for sales of

24 downloads on a flat fee basis, a cent rate basis, a royalty basis, or some other basis.

25         (h)     Whether the 1982 agreement is ambiguous, thereby potentially

26 permitting admission of particular parol evidence to interpret it under California law.

27         (i)     The existence and applicability of contractual limitations provisions

28 and conditions precedent in Whitesnake's 1982 agreement.

1        (j)     The effect on Plaintiffs' claims of fraudulent concealment of

2   Whitesnake's knowledge in or about 2004 of its ability to make the claims it made in this lawsuit

3   seven years later.

4        (k)     The manner in which "net receipts" are defined and are to be

5   calculated under Whitesnake's 1982 agreement.

6        (l)     Whether, as a non-New York resident, Whitesnake possesses a claim

7   under New York General Business Law section 349.

8        **4.     Carlton Ridenhour**

9        (a)     Whether Ridenhour has standing to bring his claims, given that he has

10  "irrevocably" authorized UMGR to pay all of his royalties to a third party.

11       (b)     Whether the parties intended to treat Ridenhour's 1986 and 1992

12  agreements as separate agreements, or intended the 1992 agreement to modify the 1986 agreement.

13       (c)     Whether downloads are "Phonograph Records" within the meaning of

14  Ridenhour's 1986 and 1992 agreements.

15       (d)     Whether download retailers are "Licensees" within the meaning of

16  Ridenhour's 1986 and 1992 agreements.

17       (e)     Whether downloads are sold through "Normal Retail Channels" within

18  the meaning of Ridenhour's 1986 and 1992 agreements.

19       (f)     Whether downloads are sold through a "Club Operation" within the

20  meaning of Ridenhour's 1986 and 1992 agreements.

21       (g)     Whether downloads are derived from "Master Recording[s] leased by

22  [UMGR] or the distributor to others for their distribution of Phonograph Records" within the

23  meaning of Ridenhour's 1986 agreement.

24       (h)     Whether downloads are derived from "Master Recording[s] leased by

25  [UMGR] to others for their distribution of Phonograph Records" within the meaning of Ridenhour's

26  1992 agreement.

27       (i)     Whether the 1986 or 1992 agreements are ambiguous, thereby

28  potentially permitting admission of particular parol evidence to interpret them under New York law.

1    (j)    Whether Ridenhour released his claims pursuant to a 1998

2  Termination Amendment.

3    (k)    Whether Ridenhour materially breached the 1986 agreement, thereby

4  excusing or discharging UMGR's obligations to him, by delivering "Materials" (as defined) which

5  "violate[d] any law or infringe[d] upon or violate[d] the rights of any Person," and by failing and

6  refusing to "at all times indemnify and hold harmless [UMGR] from and against any and all claims,

7  damages, liabilities, costs and expenses, including legal expenses and reasonable counsel fees,

8  arising out of any breach by [Mr. Ridenhour] of any warranty or representation made by [Mr.

9  Ridenhour] in this agreement," among other breaches.

10    (l)    The existence and applicability of contractual limitations provisions

11  and conditions precedent in Ridenhour's 1986 and 1992 agreements.

12    (m)    The manner in which "net receipts" are defined and are to be

13  calculated under Ridenhour's 1986 and 1992 agreements.

14    (n)    Whether, as a non-New York resident, Ridenhour possesses a claim

15  under New York General Business Law section 349.

16    **5.    Ron Tyson**

17    (a)    Whether Tyson, who is not a party to the 1987 or 1993 agreements on

18  which he is suing nor even an owner of the corporate entities that entered into those agreements, has

19  standing to sue under these agreements.

20    (b)    Whether the parties intended to treat the 1987 and 1993 agreements as

21  separate agreements, or intended the 1993 agreement to modify the 1987 agreement.

22    (c)    Whether downloads are "RECORDS" within the meaning of the 1987

23  agreement on which Tyson is suing.

24    (d)    Whether downloads are sold through a "club operation" within the

25  meaning of the 1987 agreement on which Tyson is suing.

26    (e)    Whether downloads are "Records" within the meaning of the 1993

27  agreement on which Tyson is suing.

28

JOINT CASE MANAGEMENT STATEMENT - CV-11-1613 (SI)                           - 17 -

1           (f)        Whether sales of downloads are "Net Sales of Records . . . by

2 [UMGR] or its Licensees" within the meaning of the 1993 agreement on which Tyson is suing.

3           (g)        Whether downloads are sold "via telephone, satellite, cable or other

4 direct transmission to the consumer over wire and through the air" within the meaning of the 1993

5 agreement on which Tyson is suing.

6           (h)        Whether downloads are a "form of new Record configurations" within

7 the meaning of the 1993 agreement on which Tyson is suing.

8           (i)        Whether downloads are sold by way of "licenses of Masters recorded

9 hereunder for distribution other than through Normal Retail Channels (e.g. movie soundtrack

10 albums) or other than by the distributor who normally distributes Motown Records or Records

11 hereunder in the territory concerned," within the meaning of the 1993 agreement on which Tyson is

12 suing.

13           (j)        Whether, if Plaintiff Bo Donaldson prevails on his contention that

14 downloads are not "records," Tyson cannot prevail on some or all of his claims.

15           (k)        Whether the 1987 and 1993 agreements are ambiguous, thereby

16 potentially permitting admission of particular parol evidence to interpret them under California law.

17           (l)        The existence and applicability of contractual limitations provisions

18 and conditions precedent in Tyson's 1987 and 1993 agreements.

19           (m)        The manner in which "net receipts" are defined and are to be

20 calculated under Tyson's 1987 and 1993 agreements.

21           (n)        Whether, as a non-New York resident, Tyson possesses a claim under

22 New York General Business Law section 349.

23       **6.**      **Bo Donaldson**

24           (a)        Whether Donaldson has standing to sue under the 1974 agreement on

25 which he is suing, because the right to sue under that agreement is the property of "Bo Donaldson &

26 The Heywoods," a general partnership, and Donaldson does not have the authorization of the

27 partnership to sue.

28

1              (b)      Whether downloads are "records" within the meaning of the 1974

2  agreement on which Donaldson is suing.

3              (c)      Whether downloads are "other recorded devices sold by our licensees"

4  within the meaning of the 1974 agreement on which Donaldson is suing.

5              (d)      Whether download retailers are "other parties" to which UMGR has

6  licensed recordings "for phonograph record use on a flat fee basis" within the meaning of the 1974

7  agreement on which Donaldson is suing.

8              (e)      Whether, if the other Plaintiffs prevail on their contention that

9  downloads are "records," Donaldson cannot prevail on his claims.

10            (f)      Whether the 1974 agreement is ambiguous, thereby potentially

11  permitting admission of particular parol evidence to interpret it under California law.

12            (g)      The existence and applicability of contractual limitations provisions

13  and conditions precedent in Donaldson's 1974 agreement.

14            (h)      The manner in which "net receipts" are defined and are to be

15  calculated under Donaldson's 1974 agreement.

16            (i)      Whether, as a non-New York resident, Donaldson possesses a claim

17  under New York General Business Law section 349.

18        **7.**     **William McLean and Andres Titus (collectively, p/k/a Black**

19                **Sheep)**

20            (a)      Whether downloads are "Phonograph Records" within the meaning of

Black Sheep's 1991 agreement.

21            (b)      Whether downloads are "Net Sales" within the meaning of Black

22  Sheep's 1991 agreement.

23            (c)      Whether downloads are sold through "Normal Retail Channels" within

24  the meaning of Black Sheep's 1991 agreement.

25            (d)      Whether the exploitation by means of downloads constitutes

26  "distributions" within the meaning of Black Sheep's 1991 agreement.

27

28

1                  (e)       Whether downloads are sold by way of "licenses of Master Recordings

2 to Non-Affiliated Third Parties for sales of Records by such licensees through direct mail, mail order

3 or in conjunction with TV or radio advertising, including through methods of distribution such as

4 'key outlet marketing' . . . or by any combination of the methods set forth above or other methods,"

5 within the meaning of Black Sheep's 1991 agreement.

6                  (f)       Whether downloads are sold by way of "licenses of Master Recordings

7 on a flat-fee or other royalty basis," within the meaning of Black Sheep's 1991 agreement.

8                  (g)       Whether downloads are "use(s) or exploitation(s) of Master

9 Recordings not otherwise specified" in Black Sheep's 1991 agreement.

10                  (h)       Whether download retailers, if they are "licensees" of UMGR, are

11 "affiliated" licensees  within the meaning of Black Sheep's 1991 agreement.

12                  (i)       Whether the 1991 agreement is ambiguous, thereby potentially

13 permitting admission of particular parol evidence to interpret it under New York law.

14                  (j)       Whether McLean and/or Titus materially breached the 1991

15 agreement, thereby excusing or discharging UMGR's obligations to them, by delivering "Master

16 Recordings hereunder" which "violate[d] or infringe[d] upon the rights of any third party," and by

17 repudiating and anticipatorily breaching their obligation to "indemnify, save and hold [UMGR]

18 harmless of and from any and all liability, loss, damage, cost or expense (including attorneys' fees)

19 arising out of or connected with any breach or alleged breach of this agreement or any claim which

20 is inconsistent with any of the warranties or representations made by [them] in this agreement,"

21 among other breaches.

22                  (k)       The existence and applicability of contractual limitations provisions

23 and conditions precedent in Black Sheep's 1991 agreement.

24                  (l)       The manner in which "net receipts" are defined and are to be

25 calculated under Black Sheep's 1991 agreement.

26                  (m)       Whether, as non-California residents, McLean and Titus possess

27 claims under California Business and Professions Code section 17200.

28

**IV.    SCHEDULING OF CLASS CERTIFICATION MOTION AND OTHER FURTHER PROCEEDINGS IN THE CASE**

      **A.    Plaintiffs' Position**

Plaintiffs would like to move for class certification approximately 60 days after the resolution of the pending discovery motions and the taking of the two remaining depositions. Ideally the depositions should be taken after the discovery motions are resolved and any additional documents are produced, so that they need not be reconvened with additional documents.

As to the briefing of class certification, Plaintiffs propose the following schedule:

1.    With the Court's permission, page limitations on class certification should be expanded to provide for 50 pages for Plaintiffs' opening brief, 50 pages for UMGR's opposition brief, and 30 pages for Plaintiffs' reply.

2.    If Plaintiffs provide expert declarations with their motion, UMGR should be permitted to take a one-day deposition of each expert, and the parties should endeavor to schedule that deposition within 20 days of the filing of the motion for class certification.

3.    UMGR should file its opposition brief 60 days after the filing of Plaintiffs' brief.

4.    If defendant provides expert declarations with their opposition, Plaintiff may take a one-day deposition of each expert, and the parties should endeavor to schedule that deposition within 20 days of the filing of the opposition.

5.    Plaintiffs should file their reply brief 60 days after the filing of UMGR's opposition.

UMGR's audacious proposals on scheduling are quite inconsistent with the Local Rules, standard practice in class actions, and Rule 23. Rule 23(c) provides that class certification should be resolved "at an early practicable time." To delay class certification for months in order to decide individual summary judgment issues (not binding on the class) is exactly the opposite of the standard procedure, and highly inefficient. Because the parties should be allowed to focus on completing class certification discovery and briefing class certification, and because class certification is ordinarily to be resolved before the merits, no motions for summary judgment should be filed until the motions for class certification are resolved.

1    UMGR's other suggestions – to limit Plaintiffs' total opening and reply briefs to the same

2    total number of pages as Defendant's opposition, to authorize a surrebuttal by UMGR as a matter of

3    right, and the like –are all inconsistent with standard practices and the approach of the Local Rules

4    for this District.

5        **B.      UMGR's Position**

6        UMGR agrees that class certification briefing should occur shortly after the resolution of the

7    pending discovery issues, but differs with Plaintiffs in most other particulars, as discussed more fully

8    below.  Plaintiffs' proposal gives them unilateral control over the conclusion of discovery; unfairly

9    prohibits UMGR from renewing or filing summary judgment motions prior to class certification; and

10   unfairly skews the briefing schedule for class certification in Plaintiffs' favor.  UMGR proposes the

11   following procedure, which will require diligence by both sides and ought to bring this case to a

12   reasonably prompt conclusion in calendar year 2014:

13       1.      Plaintiffs shall file their current discovery letter regarding ESI (currently in the form

14   of Exhibit A, though Plaintiffs apparently intend to further revise it) with Magistrate Judge James by

15   no later than March 10, 2014.  The parties shall be required to file any other discovery motions

16   necessary for class certification briefing by March 31, 2014.

17       2.      Upon Magistrate Judge James' last ruling (or this Court's ruling on any challenge to

18   Magistrate Judge James' rulings) on all of the discovery motions filed in March, the parties shall

19   have 90 days: (a) to fully and finally resolve any remaining discovery issues and take any

20   depositions they deem necessary preceding class certification briefing;[5] and (b) to renew or file any

21   summary judgment motions they deem appropriate before class certification briefing.

22       3.      The Court shall set class certification briefing to commence within 60 days from its

23   final ruling on any such summary judgment motions, subject to the following:

24           (a)      Each side shall be allotted 80 pages of briefing, excluding declarations and

25   exhibits.  Plaintiffs may divide their 80 pages between their opening brief and reply brief in any

---

[5]    Plaintiffs' proposal appears to allow only Plaintiffs to take additional depositions.  UMGR may also wish to take a small number of additional depositions after analyzing the state of discovery after the upcoming round of discovery motions is resolved.

1  manner they choose.  UMGR may divide its 80 pages between its opposition brief and surreply brief

2  in any manner it chooses.

3          (b)     If either side provides expert declarations with their opening or opposition

4  briefs, the other side may obtain documents from the expert on an expedited basis (15 days from the

5  date of any document request) and may take the deposition of the expert(s) within 30 days of the

6  filing of the expert's declaration.  No expert declarations shall be permitted with any reply brief.

7          (c)     Plaintiffs shall file their reply brief within 30 days of the filing of UMGR's

8  opposition brief.

9          (d)     UMGR shall file its surreply brief within 21 days of the filing of Plaintiffs'

10  reply brief, limited to responding to new material or contentions made by Plaintiffs in their reply

11  brief.

12       UMGR's proposal is superior to Plaintiffs' for several reasons.  First, Plaintiffs' request is

13  not quite what it seems, because their proposed "resolution" of the ESI issue with which they claim

14  to be concerned would not establish any definable boundaries or outside date for completion.

15  Instead, it would allow Plaintiffs to continue to drag the process out indefinitely, and continue to

16  pursue ESI (proposing new search terms, identifying new custodians, etc.) for as long as they

17  unilaterally decide to do so.  UMGR's proposal more appropriately provides an objectively

18  enforceable mechanism for class discovery to come to an end and compels both sides to act with

19  diligence.

20       Plaintiffs' page-limit proposal is not equitable and fails to take into account that Plaintiffs

21  (who will be arguing that the case involves few unique issues and few differences among the

22  contracts) will logically require fewer pages of briefing than UMGR, which will be attempting to

23  meaningfully address the vast number of unique legal and factual issues, atypical contractual

24  provisions, etc., in a way that meaningfully assists the Court, rather than just highlight issues

25  generally and force the Court to bear a greater burden of the required rigorous analysis.  UMGR is

26  not suggesting it should have more pages of briefing than Plaintiffs, but it should at least be an

27  equitable division.  Further, if Plaintiffs are permitted to file expert declarations with their reply brief

28  (which UMGR opposes), UMGR should at least be entitled to depose or re-depose those experts and

1  file a surreply focused on their reply testimony.  If the Court declines to permit a surreply at this

2  time, UMGR nevertheless requests 80 pages for its opposition brief – the same number of pages as

3  Plaintiffs have requested for their briefs and necessary in this case in light of the large number of

4  differing contracts and legal and factual issues involved.

5       Plaintiffs' belated proposal that summary judgment motions be prohibited prior to class

6  certification would be unfair and inadvisable, particularly in the context of this case.  As a threshold

7  mater, UMGR previously made a summary judgment motion to which Plaintiffs responded they

8  needed more discovery –not that such motions should be prohibited before class certification

9  altogether –and this Court specifically ruled that UMGR could renew its motion following a period

10  of discovery.  Since then, UMGR has expended substantial time, energy, and money in discovery

11  preparing to renew their prior summary judgment motion and potentially bring new ones – discovery

12  to which Plaintiffs never objected on the ground that summary judgment should be prohibited.

13  Moreover, this case involves eight separate plaintiffs suing on 11 separate written agreements, each

14  containing a different structure and different language (as can be seen just from the CAC, in which

15  Plaintiffs quote entirely different allegedly language from each agreement which they claim governs

16  the resolution of the download issues).  And discovery has shown that each of the Plaintiffs' claims

17  poses different, unique issues, some of which derive from their contracts, others from other

18  circumstances (*e.g.*, lack of standing) which justify summary judgment.  Indeed, four Plaintiffs have

19  already dropped out and dismissed their claims after discovery revealed, for various reasons, that

20  their claims were suspect and they were therefore inappropriate class representatives.  Whether or

21  not a motion binds the class is not a reason to prevent it.  Right now, there is no class (and may never

22  be) and if an individual plaintiff does not have valid claims, he or it should be dismissed, which may

23  well simplify, clarify, or otherwise assist the class certification analysis.  If upon reviewing any

24  particular motion, this Court determines its resolution is better left for a later stage of the case, the

25  Court obviously has the power to defer its ruling.  But a blanket prohibition on summary judgment

26  motions, especially imposed at this late date, would be imprudent and unfair to UMGR.  Finally,

27  Plaintiffs' assertion that summary judgment motions would "delay" class certification is

28  hypocritical, considering that it was Plaintiffs that asked to vacate the original class certification

JOINT CASE MANAGEMENT STATEMENT - CV-11-1613 (SI)                              - 24 -

1    briefing schedule over UMGR's objection; successfully opposed UMGR's prior summary judgment

2    motion ostensibly on the ground that they needed more discovery; and in the ensuing two years since

3    then, have conducted such discovery at a snails'-pace, contradicting any genuine desire to expedite

4    the class certification process.  They should not be heard to argue that class certification must now

5    suddenly be expedited at the precise moment this would most significantly prejudice UMGR.

6    **V.      PARALLEL CASES AGAINST OTHER INDUSTRY MEMBERS**

7         **A.      Plaintiffs' Position**

8         Similar cases were filed against Warner Music Group (*In re: Warner Music Group Corp.*

9    *Digital Downloads Litigation*, No. 12-00559-RS (N.D. Cal.)), and EMI Group Ltd. (*Davis v. Capitol*

10   *Records, LLC*, No. 3:12-cv-01602-YGR (N.D. Cal.)).  Plaintiffs' counsel in the three cases (and their

11   leadership roles) are heavily overlapping but not identical.  Defense counsel are different in each

12   case.  (A similar case against Sony, with different counsel, was filed years earlier in the Southern

13   District of New York and settled about the time that these cases began.)

14        A class settlement agreement has been reached in Warner, and preliminary approval was

15   granted on January 23, 2014, with a final approval hearing scheduled for October 2, 2014.  *Warner*

16   Dkt. 101.

17        EMI was the last-filed of the three cases, suffered a disqualification of defense counsel, and

18   has made the least progress.  Discovery is in an early stage.

19        **B.      UMGR's Position**

20        UMGR objects to the inclusion of this section, as the Standing Order only contemplates

21   discussion of related cases.  In any event, based on what UMGR knows of the other cases referenced

22   by Plaintiffs, the issues are substantially different than those involved in this case.

23

24

25

26

27

28

1    **VI.    SETTLEMENT AND ADR**

2           The parties have met with Judge Edward Infante (Ret.), but have not reached a settlement.

3    There have been no mediation sessions with Judge Infante for approximately one year.

4    DATED:  February 24, 2014                LEONARD B. SIMON
                                              THE LAW OFFICES OF LEONARD B. SIMON P.C.
5

6                                             _____
                                                       s/ LEONARD B. SIMON
7                                                       LEONARD B. SIMON

8                                             655 West Broadway, Suite 1900
                                              San Diego, CA  92101
9                                             Telephone:  619/338-4549
                                              Facsimile:  619/231-7423
10                                            *Chair of Lead Class Counsel Group for Plaintiffs*

11   DATED:  February 24, 2014                JEFFREY D. GOLDMAN
                                              JEFFER MANGELS BUTLER & MITCHELL LLP
12

13                                            _____
                                                       s/ JEFFREY D. GOLDMAN
14                                                     JEFFREY D. GOLDMAN

15                                            1900 Avenue of the Stars
                                              Los Angeles, CA  90067-4308
16                                            Telephone:  310/203-8080
                                              Facsimile:  310/203-0567
17                                            *Attorneys for Defendant UMG Recordings, Inc.*

18

19

20

21

22

23

24

25

26

27

28

1

**GENERAL ORDER 45 CERTIFICATION**

2       I, Leonard B. Simon, am the ECF user whose identification and password are being used to

3 file this document.   In compliance with General Order 45, Section X.B., I hereby attest that

4 concurrence in the filing of the document has been obtained from each of the other signatories.

5 DATED:  February 24, 2014

6

7                                                       s/ LEONARD B. SIMON

8                                                     LEONARD B. SIMON

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on February 24, 2014, I authorized the electronic filing of the foregoing **JOINT CASE MANAGEMENT STATEMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on February 24, 2014.

        s/ LEONARD B. SIMON
        LEONARD B. SIMON

THE LAW OFFICES OF LEONARD B. SIMON, P.C.
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/338-4549
Fax:  619/231-7423
E-mail:  lsimon@rgrdlaw.com

## Mailing Information for a Case  3:11-cv-01613-SI James v. UMG Recordings, Inc.

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Arthur Nash Bailey , Jr**
  abailey@hausfeldllp.com,celder@hausfeldllp.com

- **Raymond Paul Boucher**
  boucher@kbla.com,smendoza@kbla.com,sharo@kbla.com

- **Elliot Perry Cahn**
  cahnman@aol.com

- **Robyn C. Callahan**
  rcc@phillaw.com,rac@phillaw.com

- **Nicholas A. Carlin**
  nac@phillaw.com,rac@phillaw.com

- **Bryan L. Clobes**
  bclobes@caffertyclobes.com,docketclerk@caffertyclobes.com,ktucker@caffertyclobes.com

- **Eric B. Fastiff**
  efastiff@lchb.com,btroxel@lchb.com

- **David M. Given**
  dmg@phillaw.com,ala@phillaw.com,rac@phillaw.com

- **Jeffrey D. Goldman**
  jgoldman@jmbm.com,mastercalendar@jmbm.com,RMauck@jmbm.com,BYates@jmbm.com,rf2@jmbm.com

- **Cecilia Han**
  chan@lchb.com

- **Michael D. Hausfeld**
  mhausfeld@hausfeldllp.com

- **Roger Norton Heller**
  rheller@lchb.com,mgordon@lchb.com

- **Douglas Lowell Johnson**
  njohnson@jjllplaw.com

- **Neville L. Johnson**
  njohnson@jjllplaw.com,nkazalbasch@jjllplaw.com,nkurtz@jjllplaw.com

- **Jeffrey Alan Koncius**
  koncius@kbla.com,jmendez@kbla.com,jsalgueiro@kbla.com,narutunyan@kbla.com

- **Michael Paul Lehmann**
  mlehmann@hausfeldllp.com

- **Ryan Scott Mauck**
  rmauck@jmbm.com

- **William James Newsom**
  wnewsom@pswlaw.com,yberry@pswlaw.com

- **Clifford H. Pearson**
  cpearson@pswlaw.com

- **James J. Pizzirusso**
  jpizzirusso@hausfeldllp.com,kryan@hausfeldllp.com

- **Glenn Douglas Pomerantz**
  glenn.pomerantz@mto.com,cherryl.tillotson@mto.com

- **R. Alexander Saveri**
  rick@saveri.com

- **Melissa Conwell Shapiro**
  mshapiro@saveri.com

- **Aaron M. Sheanin**
  asheanin@pswlaw.com,yberry@pswlaw.com

- **Bruce L. Simon**
  bsimon@pswlaw.com

- **Bruce Lee Simon**
  bsimon@pswlaw.com,mpearson@pswlaw.com,cpearson@pswlaw.com,dwarshaw@pswlaw.com,wnewsom@pswlaw.com,yberry@pswlaw.com,tboardman@pswlaw.com,mwill

- **Leonard B. Simon**
  lens@rgrdlaw.com,terreed@rgrdlaw.com

- **Michael W. Sobol**
  msobol@lchb.com,nreynolds@lchb.com,mgordon@lchb.com,jrudnick@lchb.com

- **Michael W. Sobol**
  msobol@lchb.com

- **Nicole Diane Sugnet**
  nsugnet@lchb.com

- **Alexander Hilary Tuzin**
  aht@phillaw.com,rac@phillaw.com

- **Daniel L. Warshaw**
  dwarshaw@pswlaw.com,mwilliams@pswlaw.com,egrant@pswlaw.com

- **Bruce J. Wecker**
  bwecker@hausfeldllp.com

- **Kara M Wolke**
  kwolke@glancylaw.com

- **Brian Meredith Yates**
  byates@jmbm.com

- **Cadio R. Zirpoli**
  zirpoli@saveri.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
James                 Timothy Ryan
Johnson & Rishwain LLP
439 N Canon Dr #200
Beverly Hills, CA 90210
```