# EXHIBIT C

# EXHIBIT C

UMGR002574



# MEMORANDUM

| | |
|---|---|
| DATE | 9/17/02 |
| TO | Michael Reinert, Jeff Harleston, Rand Hoffman, Jeff Kempler, Neil Nagano, Sheryl Gold, Marc Lipiner, Cindy Zaplachinski |
| FROM | Michael Ostroff |
| EXTENSION | 4068 |
| SUBJECT | Online Royalties |
| COPIES | Zach Horowitz, Doug Morris, Lyor Cohen, Jimmy Iovine, Jay Boberg, Mel Lewinter, Ron Goldstein, Luke Lewis, Chris Roberts, Kedar Massenburg, Monte Lipman, Julie Greenwald, Ron Fair, Jordan Schur, Mark Williams, Kevin Liles, David Cohen, Nick Henny, Chuck Ciongoli, Dan McGill, Marjie Fieldman |

One of the ways to compete with illegitimate online services that neither pay artists nor record companies nor seek permission to use the music they exploit, is to make our music available online through legal and, ultimately, compelling alternatives. To succeed, we need our artists to support these efforts and feel positive about them. One of the ways UMG has approached this is to come up with a new royalties model for online sales. This model is one that will pay our artists more than what would be required pursuant to the terms of their contracts with us. As more fully described below, on streams and conditional downloads, we will pay artists 50% of our net receipts. On permanent downloads (which are effectively the equivalent of a physical sale through a new distribution channel), we will pay a simplified royalty eliminating items like container charges and new technology deductions.

Before implementing these changes, we decided to solicit the reaction of lawyers and managers of many of our artists to seek their input. The response in our informal discussions was overwhelmingly positive. One lawyer representing one of our most important artists asked, "What's the catch?" Another said, "This is beyond what we were hoping for." In the present atmosphere of cynicism and distrust, there will undoubtedly be some who will find a way to cast what we are doing in a negative way, particularly those whose agenda may be to create further discord between record companies and artists. However, what we are instituting is unequivocally beneficial to artists.

If we obtain artist support for our online offerings, we will take a major step forward in fighting rampant piracy through illegitimate services. With the imminent initiative to offer a large number of "a la carte" downloads, we want to make our plans widely known. This memo will summarize

how we will be paying artists for online sales of their masters and how we will let artists know of our plans.

**Online Royalty Calculations**

<u>Streams and "conditional" downloads (generally, "conditional downloads" are downloads where the access to the download disappears when the subscription lapses; pressplay, for example, offers conditional as well as permanent downloads):</u>
We will pay artists 50% of the net receipts that we receive from our contracting party.

<u>Permanent downloads (whether or not transferable to portable devices or burnable):</u>
We will pay the percentage royalty rate specified in the contract, however, unlike our physical product:
    (1) we will take <u>no</u> container charge,
    (2) we will take <u>no</u> new technology deduction,
    (3) as the current plan is to not give away free goods to help entice sales, we and our artists will be paid on all tracks sold
    (4) whether the track was sold on an individual basis or as part of an album, we will pay the *album* royalty rate, rather than the lower singles royalty rate.

If we sell the download to a customer on a wholesale basis (which is what we are currently doing with subscription services that offer permanent downloads), the royalty base price (for artists whose royalties are calculated on a "retail" basis) will be determined by uplifting the wholesale price as provided in the contract. For U.S. sales, this is typically 130%. We will also use a 130% U.S. uplift for new contracts as well. If we sell the download directly to a consumer (which is what we plan on doing with Liquid) the royalty base price will be the price the consumer pays.
In both cases, we apply the album royalty to the royalty base price without container or new technology deductions, and with no standard free goods discount.

**Getting the word out**

This is a major change that will benefit artists and we want our artists to know about it. The rates will be effective as of January 1, 2002. Effective immediately, as you talk to lawyers and managers, you should inform them about what we are doing. In addition to the basic facts as described above, you should also communicate the following points:

- While we may change our business model as to whether we sell our permanent downloads directly to consumers or on a wholesale basis (which would affect how the royalty base price is calculated) we are prepared to amend existing contracts to lock in the royalty calculation described, above, for artists.
- We are not favoring pressplay or any other online companies in which we have an ownership interest – our terms for streams and conditional downloads are essentially the same for each subscription service, and our wholesale price is the same for all services.
- We are making royalty concessions to help encourage artists to support our online initiatives. By doing so they effectively support the industry's anti-piracy efforts by bringing attention to legitimate alternatives. We need the artists' support in converting online music consumers into <u>paying</u> online music consumers.

UMGR002576

- We have listened to the issues the artists and their reps have raised, and we are taking an entirely different approach to the advent of an online business than we took at the dawn of the CD era.
- As you explain our new royalty model to artists and their representatives, reiterate how much we need their help in the ongoing battle against piracy. Ask them to speak out and be part of the industry's educational efforts. In the near term, the online business will not be a significant part of the artists or our revenues; however, the availability of legitimate alternatives to pirate websites is a critical component of our anti-piracy efforts. We also believe that, in time, online sales will grow and be profitable for our artists and us.

Also, effective immediately our new recording agreements should reflect this royalty treatment. You should make the appropriate changes to your form agreement as well as any agreements that are currently in draft. You should also offer to amend any existing recording contract (even if the term has expired) to provide for this calculation of online royalties. Even if the contract is not amended, we will instruct royalties to pay the artist at the higher rate.

Feel free to discuss the changes described in this memo with your colleagues at your labels as well as with artists and their representatives. If you have any question about how this will work, please feel free to contact me.