ASPEN PUBLISHERS

# KOHN
# ON MUSIC
# LICENSING

**FOURTH EDITION**

## AL KOHN
## BOB KOHN

*First Published as*
**The Art Of Music Licensing**

**ASPEN LAW & BUSINESS**
A Division of Aspen Publishers, Inc.
New York   Gaithersburg

 Wolters Kluwer

Law & Business

AUSTIN   BOSTON   CHICAGO   NEW YORK   THE NETHERLANDS

Certainly, the goal of the music copyright owner is to maximize the revenues generated by the musical composition. Maximizing revenue, however, involves more than merely how much money you can negotiate in exchange for granting licenses. It involves appraising the value of the song and recognizing that a variety of subtle factors dynamically affect the value of the song over time, including the types of uses, the number of uses, and the scope of uses that you permit over time. Maximizing revenue generated by a musical composition depends more on how you approach the exploitation of your music in the long run than how much money you demand in exchange for each license in the short run.

*Arete* in granting licenses to use music, accordingly, is achieved by putting the *long-term* interests of the song and the songwriter first. Recognizing that maximizing a song's revenue is a dynamic process — with the earnings potential of the music changing depending upon licensing decisions made over a period of time — is the first step in acquiring excellence in music licensing. With that in mind, we suggest that anyone who is responsible for maximizing the revenues of a song or a song catalog acquire the following three key habits:

A. Share in the economic success of the work in which the music is going to be used;

B. Maximize the long-term value of the work and avoid shortsightedness; and,

C. Maintain an active relationship between the song and the listening public.

We will explore each of these in turn.

## A. Share in the Economic Success of the Work in Which the Music Is Going to Be Used

The compensation one can collect in exchange for granting permission to use copyrighted music in another's work can be structured in a variety of ways. For example, one can receive a one-time *flat fee* (e.g., $1000 payable upon signing the license) for perpetual use, a flat fee for a limited period of use (e.g., $100 for a three-year license), or a flat fee for

a limited period of use with options to renew the term of use (e.g., $100 for a three-year license and options to renew for additional one-year periods at a rate of $100 per year). However, flat fee arrangements, even if payable over a period of time, do not take into consideration the economic success of the work in which the music is used. Under a flat fee arrangement, whether a record album in which the music is used sells 100 copies or 1 million copies, the fee for the use of the music is the same.

Music copyright owners prefer to share the risk of success or failure of works that embody their music in exchange for receiving the potential rewards of having their music associated with *hit* records, motion pictures, and other works. Producers and other users of music will assert that music copyright owners do not deserve to participate in the success of the user's work, because the copyright owner does not bear any of the financial risks associated with the production of the work. In other words, how can the music licensor fail? What does he have at risk that justifies the reward from the success of the work he seeks?

Music copyright owners respond that the producers are undervaluing the importance of their music to the producer's work. For example, a major motion picture may cost $20 million to make and perhaps an equal amount to market. Music is often an extremely important element in these movies, yet the music owners only receive a few thousand dollars at most for the use of the music. An artist performing a song in the movie might command a fee of $1 million for his work in the picture, but only a tiny fraction of that amount is paid to the songwriter who wrote the very song the artist may be performing in the film. From the music copyright owner's perspective, he is taking a risk by accepting a low fee up front in the hope that he can make up for the value the music is adding to the film by sharing in additional revenues from television performances and videocassette sales should the motion picture become successful. Music copyright owners can also point to the profit participation percentages paid to actors, writers, and directors, who are taking no more "risk" in making their contributions than the music copyright owners.

Whatever its justification, this sharing in the economic success (and failure) of works is important and is accomplished by structuring the compensation payable for music licenses in the form of a *royalty*.

Royalties are generally calculated on the basis of the number of copies of the work distributed or the revenues received from the sale or performance of the work. For example, one can receive a royalty of 5 cents for each copy of the work distributed or a royalty of 5% of the net revenues derived from the sale or licensing of the work.

Few music licenses do not provide some form of royalty or other compensation based on the economic success of the work in which the music is included. Where the license does not explicitly provide for royalty payments, some other mechanism usually exists that implicitly provides the music copyright owner with the upside earnings potential that a successful work may provide.

For example, when music licensed for use in a television program is broadcast on television, the music copyright owner will receive payments derived from the collection of performance royalties from the television stations that broadcast the program, through separate fees charged to the stations. The mechanisms involved in the collection of performance royalties are explained in some detail in Chapter 18, on *Licensing Music in Live and Recorded Public Performances*. Suffice it to say here, that the license granted to the producer of the television program to include the music in the program is, as a matter of practice, granted in exchange for a flat fee. However, the music copyright owner knows that his share in the economic success of the television program is assured from the separate license fees charged for the performance of the television program in which his music is included. If the television program becomes popular and enjoys years of broadcast in syndication, the music copyright owner will similarly enjoy continuing performance royalty credit as long as the television program remains on the air in reruns and exploitation in other markets.

For this reason, music copyright owners should not lose sight of the performance royalty earnings when considering what license fee to charge for the initial inclusion of the song in works such as television programs. If, for example, a television producer is only willing to pay a certain flat fee for permission to use your song and you insist on a fee that is double what the producer is willing to pay, the producer will often find and use a substitute for your song. Ironically, more often than not, the performance royalties earned from the broadcast of the television program would have more than compensated for the difference between the flat fee you were quoting and the fee last offered by the producer.